Kenneth R. LYLE and Warbonnet
Exploration Company,
Appellants,

v.

JANE GUINN REVOCABLE TRUST,
Perry B. Menking, Jr. Investment
Management Trust, Lynn Sahin, Kate
Lutken Bruno Grantor Trust, Wesley
Lutken Grantor Trust, Daniel R. Ja-
phet, Jr., Gretchen Japhet, Susan Ja-
phet Scotty, and Larken Japhet Suth-
erland, Appellees.

No. 01–09–00081–CV.

Court of Appeals of Texas,
Houston (1st Dist.).

March 11, 2010.

Rehearing Overruled June 14, 2010.

Gary Eugene Ellison, Gary E. Ellison, P.C., Houston, TX, for Appellants.

Lee S. Gill, Jones Gill LLP, Houston, TX, for Appellees.

Panel consists of Justices KEYES, SHARP, and MASSENGALE.

## OPINION

EVELYN V. KEYES, Justice.

This case involves the interpretation of an assignment of rights to an oil and gas lease commonly known as the Hogg–Japhet Lease. Appellants Kenneth R. Lyle and Warbonnet Exploration Company ("Warbonnet") appeal the trial court's interlocutory order granting partial summary judgment in favor of appellees, the heirs of Dan A. Japhet, a party to the original assignment (collectively, "the Japhet heirs"). In seven issues, Lyle[1] argues that the trial court erred in denying his motion for summary judgment and granting the Japhet heirs' motion for partial summary judgment and in holding that Lyle is bound by the original assignment, that Lyle is obligated to account to the Japhet heirs for his proportional share of their interest in the lease, and that Lyle is obligated to pay the Japhet heirs a one-fourth net profit royalty as referenced in the assignment. Specifically, Lyle argues that (1) the "additional consideration provision," which the Japhet heirs argue is an explanation of the one-fourth royalty interest, is actually a production payment that was fully paid and discharged prior to Lyle's acquisition of the lease; (2) no interest was reserved to Dan A. Japhet in the assignment; (3) the Japhet heirs "are strangers to [him], have no title, and [he] has superior title to his leasehold interest"; (4) the Japhet heirs have no recorded interest in the lease; (5) the Japhet heirs' claims are barred by four-year and two-year statutes of limitations, laches, extinguishment of interest, and payment of all consideration; and (6) alternatively, he presented evidence that raised genuine issues of material fact as to the proper construction of the assignment, payment, and discharge and satisfaction, and on his defenses of extinguishment of the production payment, laches, statute of limitations, and waiver.

We affirm.

## BACKGROUND

Dan A. Japhet and others conveyed an oil, gas, and mineral lease (the "Hogg–Japhet Lease") to Humble Oil & Refining Company by executing an assignment ("1919 Assignment"). The 1919 Assignment provided an account of the passage of title to the property in question from its original owners, Ima Hogg, Mike Hogg, Will C. Hogg, and Tom Hogg to Dan A. Japhet with the Hoggs' reservation of a 1/8 royalty interest. Dan A. Japhet then conveyed parts of his interest in the lease to R.S. Coon, J.A. Williams, and T.W. Wilson. The 1919 Assignment provides, in relevant part:

> [The lease] is owned in the following proportions, viz. Dan A. Japhet fifty-two-sixtieths (52/60), R.S. Coon five-sixtieths (5/60), J.A. Williams two-sixtieths (2/60) and T.W. Wilson one-sixtieth (1/60); and . . .
>
> Now Therefore, Know All Men By These Presents: that for and in consideration of the premises and of the agreements to be performed by said Humble Oil & Refining Company, as hereinafter set out, and of the payment by said [Humble Oil] to Dan A. Japhet [et al.] of the sum of $200,000, the receipt of which is hereby acknowledged, said Dan A.

---

1. Warbonnet is listed as a party to this appeal, and Lyle argues that Warbonnet does not have an interest in the lease, and therefore has no liability under it. The trial court agreed that Warbonnet did not have an interest in the Hogg–Japhet Lease and the summary judgment order finds liability only as to Lyle. The Japhet heirs do not contest any portion of the trial court's order, so we consider the issues raised in this appeal only as they relate to Lyle.

Japhet [et al.] have bargained, sold, transferred and conveyed unto [Humble Oil] all of their right, title and interest [in the lease], subject to the royalty interests reserved under [the original in which the Hoggs conveyed the land] and transfers hereinbefore referred to, and to the royalties herein reserved to assignors, and subject also to any and all of the conditions and agreements to be performed by [Humble Oil], as hereinafter set out. . . .

TO HAVE AND TO HOLD unto the said Humble Oil & Refining Company, its [successors] and assigns, forever.

[Humble Oil], by its acceptance hereof, and in consideration of this transfer, agrees to comply with each and every obligation of said assignors hereafter arising or becoming incumbent upon them as sub-leasees. . . .

In further consideration of this transfer [Humble Oil] further agrees to carry [Dan A. Japhet et al.] for a working interest of one-fourth (1/4) of the net money profit realized by it from its operations upon said tracts of land, accountings to be had monthly once profits begin to accrue, and no expense commonly known as over-head expense, such as head-office superintendence, book-keeping, cost of rendering accounts, etc. to be charged against said land or against assignors; nor shall [Humble Oil], in computing the profits, be entitled to reimburse itself for the cash consideration above receipted for. However, while assignors shall in no case be called upon to repay any part of any payments made to them under previous monthly accountings, nevertheless at the end of each calendar month [Humble Oil] shall have the right to carry forward the loss, if any, shown by the month's operations as a charge against the returns from said tract of land for the first and succeeding months

as may be necessary to reimburse it therefor. All monies to become due hereunder to assignors shall be payable to them by [Humble Oil] in the proportions in which assignors own said original contract, as hereinbefore specifically set out. . . .

It is further agreed that all the conditions and terms hereof shall extend to the heirs, executors, legal representatives, successors and assigns of the parties hereto.

The 1919 Assignment was executed on February 20, 1919 and recorded in the Deed Records of Brazoria County.

Dan A. Japhet and Humble Oil also executed a second agreement on February 20, 1919 conveying certain personal property and stored oil from Japhet to Humble Oil. That agreement provided, in relevant part:

WHEREAS, on the 20th day of February, 1919, Dan A. Japhet, R.S. Coon, T.W. Wilson, and J.A. Williams . . . transferred to the Humble Oil & Refining Company . . . certain leases owned by them[, including the lease in question here].

WHEREAS, [Dan A. Japhet et al.] have agreed to convey to [Humble Oil] all of their right, title and interest in and to the oil in storage and the hereinafter described personal property located on said 22½ acres of land, [Humble Oil] having agreed to take charge of all operations upon said plots of land from and after February 20, 1919, at six o'clock P.M. and further agreed to conduct all operations at its own cost and expense, including the payment for the labor performed and material used upon said premises, and to pay to [Dan A. Japhet et al.] from said time their one-fourth (1/4) royalty interests accruing from production, as specified in said transfers;

NOW, THEREFORE, in consideration of the promises, the parties hereto have agreed as follows:

### First.

In consideration of the sale to it of all of the interest of [Dan A. Japhet et al] in and to said oil, [Humble Oil] has paid to [Dan A. Japhet et al.] the sum of $20,000.00, the receipt of which is hereby acknowledged. It is the understanding of the parties hereto that the interest of [Dan A. Japhet et al.] in and to such oil is at least 26,000 barrels; this including the oil in storage upon said tracts of land and 5139.45 barrels in the storage tanks of [Humble Oil]. In this connection it is agreed that if said oil shall not measure out as much as 26,000 barrels, [Dan A. Japhet et al.] shall refund to [Humble Oil] for any deficit, proportionately.

### Second.

[Dan A. Japhet et al.], for and in consideration of the sum of $5,000.00 to them paid, the receipt of which is hereby acknowledged, agree to sell and transfer or cause to be transferred to [Humble Oil], a certain drilling rig owned by the Sutherland Oil Company and situated on said 2½ acre tract of land. As part consideration for the $50,000.00 paid to R.S. Coon and the Sutherland Oil Company under said transfer of the contract on said 2½ acre tract, [Dan A. Japhet, et al.] hereby convey to [Humble Oil] all of the personal property owned by them and situated upon said 2½ acre tract of land. In part consideration of the payment to [Dan A. Japhet et al.] of the $200,000.00 for the transfer of the lease contract upon said twenty (20) acres of land, [Dan A. Japhet et al.] hereby convey to [Humble Oil] all of the personal property owned by them and situated upon said 20–acre tract of land, including a drilling rig, boilers, tanks, pipe, horses, wagons, buggy, harness, and all tools and machinery.

### Third.

It is further agreed that from and after six o'clock, P.M. February 20, 1919, all operations upon said 2½ and 20 acre leases, transferred to [Humble Oil] have been and shall be conducted at the cost and expense of [Humble Oil], and that from said time [Humble Oil] shall pay [Dan A. Japhet et al.] for royalties accruing to them under the terms and provisions of said transfers which are referred to and made part hereof.

In 1969, Humble Oil assigned the lease to Salmon Corporation, and the Humble Oil–Salmon assignment recited:

The above described lease is subject to the following:

(a) An Agreement dated February 20, 1919, as amended, between Humble Oil & Refining Company and Dan A. Japhet et al. It is specifically understood that Assignee takes the property subject to said Agreement and Assignor makes no representations as to what items should or will be charged as expenses or taken into consideration in determining profits under said Agreement.

The lease was assigned several more times, and the same "subject to" language appeared in each of the assignments. Dan A. Japhet left his estate to his three sons, the last of whom died in 1990.

On November 21, 1990, Lyle purchased the portion of the "net profit interest" in the Hogg–Japhet lease belonging to the estate of E.C. Wilson, the heir of T.W. Wilson, who, along with Dan A. Japhet, was one of the parties to the 1919 Assignment.

Lyle then took over as the operator of the Hogg–Japhet Lease in 1991, and Mary Louise Hablinski assigned her interest in the lease to Lyle. That assignment also provided:

> The above described lease is subject to ... an agreement dated February 20, 1919, as amended, between Humble Oil and Refining Company and Dan A. Japhet, et al. It is specifically understood that Assignee makes no representations as to what items should or will be charged as expenses or taken into consideration in determining profits under said Agreement.

The estate of Dan A. Japhet ("Japhet Estate") was listed as an owner of an interest in the Hogg–Japhet lease on the 2001–2002 Brazoria County tax rolls, and Dan R. Japhet paid the taxes on that interest on behalf of the Estate. Subsequently, Lyle sent the tax assessor a list of owners that excluded the Japhet Estate, resulting in the Japhet Estate's removal from the county tax rolls. In 2003, Dan R. Japhet contacted Lyle regarding the Japhet heirs' interest in the lease and demanded that Lyle give an accounting of the interest and pay one-fourth of the net profits to them. Lyle refused to do so.

On October 1, 2004, the Japhet heirs filed this lawsuit alleging causes of action to "recover title and possession of the Reserved NPI[2] and to quiet their title thereto," for breach of the 1919 Assignment and specific performance of its covenants, for a declaratory judgment "concerning the existence of the Reserved NPI, the proper calculation of the net profits, and other matters arising under the 1919 Assignment," and for attorney's fees. A subsequent amended petition also added a cause of action for breach of Lyle's duty to pay the royalty.

Lyle generally denied the Japhet heirs' causes of action and asserted affirmative defenses of statute of limitations, laches, satisfaction and accord, waiver, and statute of frauds. Lyle also argued that he owned only 17.25% of the leasehold.

The Japhet heirs filed their motion for partial summary judgment seeking "judgment that they are entitled to ... an accounting by Defendants for 52/60 of 25% of any and all net profits from the Hogg–Japhet Lease and an order directing specific performance of their contract with Defendants." The Japhet heirs argued that they were the successors in interest of Dan A. Japhet's 52/60 of the reserved one-fourth net profit royalty. The Japhet heirs provided an abstract of title showing the chain of title from Dan A. Japhet to them.

Lyle responded to the Japhet heirs' summary judgment motion and filed his own motion for summary judgment arguing that the heirs did not have an interest in the leasehold because (1) the 1/4 net profit interest was "merely additional consideration" and not a reserved right from the leasehold and (2) their claims were barred by the statute of limitations and laches. In response to Lyle's motion for summary judgment, the Japhet heirs reasserted their argument that the 1919 Assignment is a valid and enforceable contract that unambiguously reserved a net profits interest in Dan A. Japhet, and that they, as heirs of Dan A. Japhet, are the record owners of the reserved interest.

The trial court granted the Japhet heirs' motion for summary judgment in part and denied Lyle's motion for summary judgment. The trial court's order specifically stated:

> 2. In the 1919 Assignment, Humble agreed, in "further consideration of this

---

2. Net Profit Interest.

transfer" to "carry Dan A. Japhet [et al] for a working interest of one fourth (1/4) of the net money profit realized by [Humble] from its operations" upon the Hogg–Japhet Lease. As stipulated in the 1919 Assignment, Dan A. Japhet owned an undivided 52/60 of the carried working interest of one fourth (1/4) of the net money profit realized from operations on the Hogg–Japhet Lease.

3. The 1919 Assignment is binding on the successors and assigns of the parties to it, subject to the terms and conditions therefor.

The trial court also found that the Japhet heirs are the "present-day successors in interest to Dan A. Japhet" and the "present-day owners of said 52/60 of the carried working interest of one fourth (1/4) of the net profit realized from operations on the Hogg–Japhet Lease." Regarding Lyle and Warbonnet, the trial court found:

5. Defendant Kenneth R. Lyle is one of the successors in interest of [Humble Oil] and is bound by the 1919 Assignment. Defendant Warbonnet is not a successor in interest of [Humble Oil] and is not bound by the 1919 Assignment, and no liability is assessed against Warbonnet. Defendant Warbonnet is a "contract operator" pursuant to a written operating agreement among the working interest owners.

6. Defendant Lyle is required under the 1919 Assignment to account to the Plaintiffs, during each of the Plaintiffs' respective ownership periods, for his proportional share (17.125%) of the carried working interest of one-fourth (1/4) of the net money profit realized from operations conducted on the Hogg–Ja-

phet Lease, from and after four years prior to the filing of this suit.

The trial court signed an order for interlocutory appeal of the partial summary judgment pursuant to Texas Civil Practice and Remedies Code section 51.0014(d),[3] and this appeal followed.

## DISCUSSION

### Standard of Review

We review a trial court's grant or denial of summary judgment de novo. *Provident Life & Accident Ins. Co. v. Knott,* 128 S.W.3d 211, 215 (Tex.2003). To prevail on a traditional summary judgment motion, the movant has the burden of proving that it is entitled to judgment as a matter of law and that there are no genuine issues of material fact. Tex.R. Civ. P. 166a(c); *Cathey v. Booth,* 900 S.W.2d 339, 341 (Tex. 1995). A defendant who negates at least one essential element of the cause of action or establishes all of the elements of an affirmative defense is entitled to summary judgment. *Cathey,* 900 S.W.2d at 341. When both parties move for summary judgment and the trial court grants one motion and denies the other, the reviewing court should review the summary judgment evidence presented by both sides, determine all questions presented and render the judgment that the trial court should have rendered. *Tex. Workers' Comp. Comm'n v. Patient Advocates,* 136 S.W.3d 643, 648 (Tex.2004).

### Lyle's Obligations Under the 1919 Assignment

In his first four issues, Lyle argues that the trial court erred in granting the Japhet

3. Section 51.014(d) of the Civil Practice and Remedies Code allows interlocutory appeal of otherwise unappealable orders if:

(1) the parties agree that the order involves a controlling question of law as to which there is a substantial ground for difference of opinion;

(2) an immediate appeal from the order may materially advance the ultimate termination of the litigation; and

(3) the parties agree to the order.

Tex Civ Prac. & Rem.Code Ann. § 51.014(d) (Vernon 2008).

heirs' summary judgment motion and denying his own because he is not subject to the provisions in the 1919 Assignment. In his first issue, Lyle argues that the trial court erred in holding that he was obligated to account to each of the Japhet heirs during their respective ownership periods for his proportional share of the carried working interest of one-fourth of the net money profit realized from operations conducted on the Hogg–Japhet Lease. In his second issue, Lyle argues that the "working interest of one-fourth (1/4) of the net money profit realized" was a production payment or oil payment, which was fully paid and discharged prior to his acquisition of the lease. In his third issue, Lyle argues that no interest was reserved to Dan A. Japhet in the 1919 Assignment and that his "assignments were only subject to the agreement of February 20, 1919, as amended, not the assignment itself." In his fourth issue, Lyle argues that he is not obligated to account to the Japhet heirs because they are strangers to him, because they have no title, and because he has superior title to his leasehold interest. In his fifth issue, Lyle argues that the Japhet heirs have no record interest in the lease.[4]

The Japhet heirs claim that Dan A. Japhet reserved a one-fourth net profit interest in the lease in the 1919 Assignment and that Lyle is bound by the 1919 Assignment's covenants.

## A. Interpretation of the 1919 Assignment

"[T]he general rule in oil and gas law [is] that controversies regarding assignors and assignees are governed by the construction and interpretation of the pro-

visions of the assignment itself and the collateral contracts of the parties." *EOG Res., Inc. v. Hanson Prod. Co.,* 94 S.W.3d 697, 702 (Tex.App.-San Antonio 2002, no pet.). If a contract is unambiguous, a court must enforce the contract as written. *Heritage Res., Inc. v. NationsBank,* 939 S.W.2d 118, 121 (Tex.1996); *see EOG Res.,* 94 S.W.3d at 701 ("The interpretation of an unambiguous contract is a question of law and we are not required to defer to any interpretation afforded by the trial court.") (citing *MCI Telecomm. Corp. v. Tex. Utils. Elec. Co.,* 995 S.W.2d 647, 650 (Tex.1999)). Whether a contract is ambiguous is itself a question of law. *Id.* The instrument alone will usually be deemed to express the intention of the parties, for it is the objective and not the subjective intent that controls. *Sun Oil Co. v. Madeley,* 626 S.W.2d 726, 731 (Tex.1981). When an instrument is not ambiguous on its face, extrinsic evidence may not be used to create ambiguity. *Balandran v. Safeco Ins. Co.,* 972 S.W.2d 738, 745 (Tex.1998).

Here, the 1919 Assignment, by its plain language, conveyed the lease from Dan A. Japhet et al. to Humble Oil. Humble Oil paid $200,000 for the lease, the receipt of which Dan A. Japhet and the other assignors acknowledged in the assignment. Humble Oil received all of the assignors' "right, title and interest . . . subject to . . . the royalties herein reserved to assignors." The parties then set out the specific terms of the royalty and the method by which it would be calculated, providing that Humble Oil agreed "to carry [Dan A. Japhet et al.] for a working interest of one-fourth (1/4) of the net money profit realized by it from its operations" on the lease. The parties to the 1919 Assignment further

---

**4.** Lyle also conclusorily asserts that the Japhet heirs do not have standing to pursue their claims, but provides no further briefing or citation to authority beyond his arguments that they do not have a property interest in

the lease. We will discuss the nature of the Japhet heirs' interest below, and any other standing complaints that Lyle intended to raise are waived for inadequate briefing. *See* Tex.R.App. P. 38.1(i).

agreed that "accountings [would] be had monthly once profits begin to accrue" and that "all the conditions and terms hereof shall extend to the heirs, executors, legal representatives, successors and assigns of the parties hereto."

■ Lyle argues that the interest created by the 1919 Assignment is a "carried interest" or "net profit interest," not a royalty, and that the Japhet heirs do not have a present property interest in the lease. Lyle does not define "net profit interest," but he argues that "[i]t is customary for a carried interest arrangement to cease when all costs as to the carried party are satisfied" and that "[t]he carry in the Japhet/Humble Assignment would end when the total consideration of $200,000 was paid out of future production, which occurred in 1928." However, these arguments are refuted, as a matter of law, by the plain meaning of the 1919 Assignment.

■ A royalty is a "share of the product or profit reserved by the owner for permitting another to use the property. In its broadest aspect royalty is a share of profit reserved by the owner for permitting another the use of the property." *Alamo Nat'l Bank v. Hurd*, 485 S.W.2d 335, 338 (Tex.Civ.App.-San Antonio 1972, writ ref'd n.r.e.) (citing *Griffith v. Taylor*, 156 Tex. 1, 291 S.W.2d 673, 676 (1956)). In the oil and gas industry,

> Royalty ... is commonly understood to be that part or share of production reserved or to be paid during the life of the lease; and generally speaking, the royalty created, excepted, or reserved under the terms of an oil and gas lease, is the right to receive, either in kind or its equivalent in money, a stipulated fraction of the oil or gas produced and saved from property covered by the lease, free of all costs of development and production.

*Id.* "A royalty interest derives from the grantor's mineral interest and is a nonpossessory interest in minerals that may be separately alienated," and "[t]he interest conveyed or reserved is to be determined from all of the provisions of the instrument." *Hamilton v. Morris Res., Ltd.*, 225 S.W.3d 336, 344 (Tex.App.-San Antonio 2007, pet. denied) (quoting *Temple–Inland Forest Prod. v. Henderson Family P'ship, Ltd.*, 958 S.W.2d 183, 186 (Tex.1997)).

The 1919 Assignment expressly states that the assignment to Humble Oil is subject to "the royalties herein reserved to assignors." The 1919 Assignment provided that the royalty would be one-fourth of the profit realized. This is clearly a reservation of "the right to receive ... a stipulated fraction of the oil or gas produced and saved from the property ... free of all costs of development and production." *See id.* Furthermore, the 1919 Assignment expressly states that receipt of the full $200,000 was acknowledged by Dan A. Japhet and the other assignors at the time they executed the assignment, and the parties did not provide any indication that the interest was to terminate when a certain quantity of production or amount of profit was realized.

■ The royalty interest is also, as a matter of law, a property interest. "It is well-settled that a royalty interest in an oil and gas lease is an interest in real property, held to have the same attributes as real property." *Kelly Oil Co. v. Svetlik*, 975 S.W.2d 762, 764 (Tex.App.-Corpus Christi 1998, pet. denied) (citing *Garza v. De Montalvo*, 147 Tex. 525, 217 S.W.2d 988, 992 (1949)). The right to receive royalty payments is one of the five attributes comprising a severed mineral estate and is a "separate, distinct property interest that may be conveyed or reserved in connection with a conveyance of a mineral interest." *Hamilton*, 225 S.W.3d at 344.

 Lyle also argues that the one-fourth royalty interest was a "production payment" or "oil payment." An "oil payment" is another term for a "production payment" and is "a share of the oil produced from the described premises, free of costs of production, terminating when a given volume of production has been paid over, or when a specified sum from the sale of such oil has been realized." *Alamo Nat'l Bank*, 485 S.W.2d at 340. An oil payment is limited in duration. *See id.* at 338–39 ("'Overriding royalties,' 'oil payments,' and 'production payments' are terms usually referring to an interest carved out of the lessee's or operator's interest, in addition to the lessor's royalty. An overriding royalty is an interest running throughout the term of the lease, while an oil payment or production payment is an interest running only until it has yielded a specified sum of money."). This is not the type of arrangement contemplated in the 1919 Assignment, which, by its plain and unambiguous language, provided for Humble Oil to purchase all of the interest in the lease for $200,000 paid at the time the agreement was made, with the reservation of a one-fourth royalty interest in the net profits.

 Furthermore, Lyle's argument that his "assignments were only subject to the agreement of February 20, 1919, as amended, not the assignment itself" is not supported by the plain language of the 1919 Assignment and the collateral agreement of the parties entered on the same day. The collateral agreement conveyed the stored oil on the lease to Humble Oil in exchange for $20,000 paid to Dan A. Japhet et al. and conveyed other personal property on the lease to Humble Oil as part of the assignment of the lease in return for the $200,000 the assignors had already received. Nothing in the language of the collateral agreement can be construed as changing the terms set out in the 1919 Assignment.[5]

We conclude that the 1919 Assignment reserved for Dan A. Japhet 52/60 of the one-fourth royalty interest in the profits realized from Humble Oil's operations on the lease and obligated Humble Oil to provide monthly accountings to Dan A. Japhet. We next consider whether the 1919 Assignment is binding on Lyle and obligates him to provide an accounting and make payments to the Japhet heirs.

## B. 1919 Assignment's Effect on Lyle

 "[A] purchaser is bound by *every* recital, reference and reservation contained in or fairly disclosed by any instrument which forms an essential link in the chain of title under which he claims." *Westland Oil Dev. Corp. v. Gulf Oil Corp.*, 637 S.W.2d 903, 908 (Tex.1982). As stated in *Westland Oil*,

> The rationale of the rule is that *any* description, recital of fact, or reference to other documents puts the purchaser upon inquiry, and he is bound to follow up this inquiry, step by step, from one discovery to another and from one instrument to another, until the whole series of title deeds is exhausted and a complete knowledge of *all the matters referred* to and affecting the estate is obtained.

5. To the extent that Lyle is arguing that there was a later amendment to the 1919 Assignment that altered the rights and obligations of the parties, we decline to consider this issue because Lyle failed to produce any evidence of such an amendment. We resolve controversies regarding assignors and assignees by constructing and interpreting the provisions of the assignment itself and the collateral contracts of the parties. *EOG Res., Inc. v. Hanson Prod. Co.*, 94 S.W.3d 697, 702 (Tex. App.-San Antonio 2002, no pet.).

*Id.* (quoting *Loomis v. Cobb,* 159 S.W. 305, 307 (Tex.Civ.App.-El Paso 1913, writ ref'd)).[6]

▮ The 1991 assignment from Hablinski to Lyle clearly stated that the lease was "subject to ... an agreement dated February 20, 1919, as amended, between Humble Oil and Refining Company and Dan A. Japhet, et al.," as did every other assignment of the lease between 1969 and 1991. The 1919 Assignment itself was recorded in the Brazoria County property records and contained the specific details of the interests reserved by Dan A. Japhet and the other assignors when they conveyed the lease to Humble Oil. Therefore, Lyle had notice of the 1919 Assignment and the covenants it contained. *See id.*

▮ Furthermore, Lyle is bound by the covenants recited in the 1919 Assignment as a matter of law because they are covenants that run with the land. "In order for the covenant to run with the land there must be privity of estate between the parties to the agreement. This means there must be a mutual or successive relationship to the same rights of property." *Westland Oil,* 637 S.W.2d at 910–11. The covenant must also "touch and concern" the land. *Id.* at 911. "If the promisor's legal relations in respect to the land in question are lessened—his legal interest as owner rendered less valuable by the promise—the burden of the covenant touches or concerns that land." *Id.* (quoting Bigelow, *The Content of Covenants in Leases,* 12 MICH. L.REV. 639 (1914), and Williams, *Restrictions on the Use of Land: Covenants Running with the Land at Law,* 27 TEX. L.REV. 419 (1949)). Here, Lyle, as the

most recent assignee of the lease, has a "successive relationship to the same rights of property" as Humble Oil, and the Japhet heirs, as inheritors of Dan A. Japhet's interests, have a successive relationship to the same property rights as Dan A. Japhet. *See id.* The covenant to pay a one-fourth royalty also clearly touches and concerns the land as it affects the value of the lease. *See id.* Therefore, Lyle is bound by the covenants recited in the 1919 Assignment.

## C. The Japhet Heirs' Chain of Title

Lyle argues that the Japhet heirs "have failed to demonstrate record chain of title, much less superior title to [his] interest, [which] is verifiable through a clear chain of recorded Assignments." He further argues that the Japhet heirs rely on "unrecorded documents, out-of-county probates and other matters not filed in Brazoria County" in their attempt to assert a claim of title. The Japhet heirs argue that they "are the present owners of the rights vested in Dan A. Japhet by the 1919 Assignment" and that "[t]he summary judgment evidence contains a complete chain of title from Dan A. Japhet through his will to his three sons ... and their estates."

▮ Lyle's argument is unavailing. As we have already discussed, the 1919 Assignment unambiguously and by its plain language reserved a royalty interest to Dan A. Japhet, and Lyle, as a successor to Humble Oil, is bound by Humble Oil's covenants to account for and pay the royalty interest. The 1919 Assignment was recorded in the Brazoria County Property records. The Japhet heirs had only to

---

**6.** Lyle argues that *Westland Oil* is not applicable here "because the subsequent Assignments are not subject to the 1919 Assignment; and the stated consideration in the 1919 Assignment was paid, satisfied and no longer valid and subsisting." As we have already

discussed, the subsequent assignments of the Hogg–Japhet Lease all stated that they were subject to the 1919 Assignment, and the "consideration"—the one-fourth royalty interest—was not of limited duration and, therefore, it had not been paid or satisfied.

demonstrate to the trial court that, as a matter of law, they had inherited Dan A. Japhet's right to the royalty interest. The Japhet heirs filed an abstract of title, totaling 185 pages, including the appendix and various supporting assignments, deeds, and probate instruments that reflect the transfer of the interest from Dan A. Japhet's estate to his sons and then to the present heirs. On appeal, Lyle argues that the Japhet heirs' summary judgment is inadmissible "on grounds of incompetence, conclusory, not the best evidence, self-serving, speculative, hearsay, unauthenticated, [and] failure to lay predicate." However, Lyle fails to point to specific parts of the 185–page abstract of title that demonstrate the errors he alleges or to advance any argument beyond a mere list of alleged deficiencies. Therefore, his complaints regarding the summary judgment evidence submitted by the Japhet heirs to demonstrate their chain of title are waived for failure to adequately brief them. *See* Tex.R.App. P. 38.1(i).

We also conclude that Lyle's argument that he has "superior" title to the leasehold is unsuccessful. The Japhet heirs claim only their proportionate shares of the one-fourth royalty interest reserved to Dan A. Japhet in the 1919 Assignment—not any of the other interests in the mineral estate. *See Hamilton*, 225 S.W.3d at 344 ("A severed mineral estate is comprised of five attributes: (1) the right to develop (the right to ingress and egress), (2) the right to lease (the executive right), (3) the right to receive bonus payments, (4) the right to receive delay rentals, and (5) the right to receive royalty payments."). The assignment under which Lyle received his inter-

est clearly stated that it was subject to the royalty interest reserved in the 1919 Assignment, so, as a matter of law, Lyle does not have "superior title" to that royalty interest. *See id.* ("A conveyance of a mineral estate need not dispose of all interests; individual interests can be held back, or reserved, in the grantor. . . . The interest conveyed or reserved is to be determined from all the provisions of the instrument.").

We conclude that the trial court did not err in holding, as a matter of law, that Lyle is bound by the 1919 Assignment and is obligated to account for and pay the Japhet heirs for their shares of the one-fourth royalty interest in his portion of the lease. Tex.R. Civ. P. 166a(c); *Tex. Workers' Comp. Comm'n*, 136 S.W.3d at 648; *Cathey*, 900 S.W.2d at 341.

We overrule Lyle's first, second, third, fourth, and fifth issues.

### Affirmative Defenses

In his sixth issue, Lyle argues that the trial court erred in denying his motion for summary judgment because the Japhet heirs' claims are barred by the statute of limitations, laches, and the statute of frauds.[7]

### A. Statute of Limitations

Lyle argues that the Japhet heirs' claim is barred by the statute of limitations. Lyle correctly points out that both a breach of contract claim and a claim for specific performance of a contract for conveyance of real property have

---

**7.** Lyle also lists extinguishment of interest and payment of all consideration as additional affirmative defenses that preclude the trial court's determination that Lyle is bound by the 1919 Assignment to account to and pay the Japhet heirs for the one-fourth royalty

interest. However, he does not provide any arguments, citations to authority, or citations to the record to support his argument. Therefore, his arguments on those issues are waived for failure to adequately brief. *See* Tex.R.App. P. 38.1(i).

a four-year statute of limitations.[8] *See* Tex. Civ. Prac. & Rem.Code Ann. § 16.004(a) (Vernon 2002); *see also Headington Oil Co. v. White,* 287 S.W.3d 204, 214 (Tex. App.-Houston [14th Dist.] 2009, no pet.) ("The statute of limitations for the recovery of royalty payments is four years."). However, "[i]f the parties' agreement contemplates a continuing contract for performance, the limitations period does not usually commence until the contract is fully performed." *Davis Apparel v. Gale–Sobel, a Div. of Angelica Corp.,* 117 S.W.3d 15, 18 (Tex.App.-Eastland 2003, no pet.) (citing *Intermedics, Inc. v. Grady,* 683 S.W.2d 842, 845 (Tex.App.-Houston [1st Dist.] 1984, writ ref'd n.r.e.)). Furthermore, "if the terms of an agreement call for periodic payments during the course of the contract, a cause of action for such payments may arise at the end of each period, before the contract is completed." *Intermedics,* 683 S.W.2d at 845. Therefore, the statute of limitations here, where the 1919 Assignment contemplated a monthly accounting and payment for the one-fourth royalty, only bars recovery of the royalty payments accruing more than four years prior to the filing of the suit. *See id.; see also Headington Oil Co.,* 287 S.W.3d at 214 (holding that statute of limitations barred royalty owner's claims against oil lease operator for events more than four years prior to filing of suit); *Dvorken v. Lone Star Indus., Inc.,* 740 S.W.2d 565, 567 (Tex.App.-Fort Worth 1987, no writ) ("If a continuing breach has occurred then appellants would be entitled to damages from four years prior to the filing of their original petition . . . ."). The trial court's order held that Lyle is required under the 1919 Assignment to ac-count to the Plaintiffs for the one-fourth royalty interest "from and after four years prior to the filing of this suit."

Therefore, we conclude that the Japhet heirs' claims are not barred by the statute of limitations.

## B. Laches

Lyle also argues that the Japhet heirs' claims are barred by laches. Specifically, he argues that the royalty interest in the net profits had not been paid to the Japhets in over sixty years.

"Two essential elements of laches are (1) unreasonable delay by one having legal or equitable rights in asserting them; and (2) a good faith change of position by another to his detriment because of the delay." *In re Jindal Saw Ltd.,* 264 S.W.3d 755, 760 (Tex.App.-Houston [1st Dist.] 2008, orig. proceeding). (quoting *Rogers v. Ricane Enters.,* 772 S.W.2d 76, 80 (Tex.1989)). "As a general rule, laches is inappropriate when the controversy is one to which a statute of limitations applies." *Graves v. Diehl,* 958 S.W.2d 468, 473 (Tex.App.-Houston [14th Dist.] 1997, no pet.). Here, Lyle has presented no evidence or argument that laches should apply to the Japhet heirs' claims to recover the royalty interest or that he made "a good faith change of position" to his detriment because of the delay.

Therefore, Lyle failed to establish as a matter of law that the Japhet heirs' claims are barred by laches.

## C. Statute of Frauds

Lyle also argues that the Japhet heirs' claims are barred by the stat-

---

8. Lyle also argues that "[a] two-year statute of limitations applies to suits for trespass for injury to the estate or property of another, for conversion of personal property, and for taking or detaining the personal property of an-other." However, the Japhet heirs did not actually plead any of these causes of action, nor does the trial court's interlocutory order address these them. Therefore, we do not consider this argument.

ute of frauds. The statute of frauds requires that certain agreements be in writing and that they be signed by the person to be charged with the promise or agreement to be enforceable. *See* TEX. BUS. & COM.CODE ANN. § 26.01 (Vernon 2009). Agreements to assign an interest in an oil and gas leasehold estate are subject to the requirements of the statute of frauds. *Westland Oil*, 637 S.W.2d at 908. As we have already discussed, the 1919 Assignment was in writing and was signed by all of the parties involved in that transfer of the lease. Lyle subsequently signed the 1991 assignment in which Hablinski transferred a portion of that lease to him with the express statement that the assignment was made subject to the 1919 Assignment. This satisfies the statute of frauds.

We conclude that the Japhet heirs' claims are not barred by the statute of frauds.

We overrule Lyle's sixth issue.

### Alternative Ground for Reversal

Alternatively, in his seventh issue, Lyle argues that he presented evidence that raised genuine issues of material fact as to the proper construction of the assignment, payment, and discharge and satisfaction, and on his defenses of extinguishment of the production payment, laches, statute of limitations, and waiver. However, Lyle does not present any analysis or citation to authority for this issue beyond the arguments he presented on his first six issues.

As we have already held in analyzing his previous six issues, the Japhet heirs' rights were determined as a matter of law based on the 1919 Assignment between Humble Oil and Dan A. Japhet and the subsequent assignments of the Hogg–Japhet lease. *See* TEX.R. CIV. P. 166a(c); *Cathey v. Booth*, 900 S.W.2d 339, 341 (Tex.1995) (holding movant is entitled to summary judgment when it proves that it is entitled to judgment as a matter of law). To the extent that Lyle is attempting to raise new arguments in his seventh issue, they are waived for failure to adequately brief. *See* TEX.R.APP. P. 38.1(i).

We overrule Lyle's seventh issue.

### CONCLUSION

We affirm the judgment of the trial court.