**Opinion filed May 28, 2021**



In The

# Eleventh Court of Appeals

_____

## No. 11-19-00022-CV

_____

## GRAMRICH OIL & GAS CORPORATION, NOLAN ENERGY CORPORATION, AND SL RICHARDSON INVESTMENTS, INC., Appellants/Cross-Appellees

## V.

## WILLIAM C. MENG, Appellee/Cross-Appellant

**On Appeal from the 39th District Court**

**Throckmorton County, Texas**

**Trial Court Cause No. 3165**

### M E M O R A N D U M   O P I N I O N

This appeal arises from a lawsuit that was originally filed in 2001. It concerns a dispute over an oil and gas lease. Appellants and Cross-Appellees are Gramrich Oil & Gas Corporation, Nolan Energy Corporation, and SL Richardson Investments, Inc. (collectively Lessees). Gramrich and Nolan filed suit in 2001 against the lessor, William C. Meng. SL Richardson joined the suit sometime later.

After a summary judgment hearing, the trial court granted Meng's traditional and no-evidence motion for summary judgment on all grounds, denied Lessees' motion for partial summary judgment, and entered final judgment disposing of all claims pending between the parties. The parties present numerous issues on appeal. The primary issues concern lease termination and repudiation, laches, standing, evidentiary objections, attorney's fees, and the trial court's declaration of final judgment. We affirm in part, and we reverse and remand in part.

*Background facts*

In 1996, Meng granted Nolan an oil and gas lease on his ranch in Throckmorton County. Gramrich was the sole operator on the Meng lease from the time the lease was executed until 2013. Gramrich drilled multiple wells in 2000 and 2001, and another two wells after 2005. Tamarron Resources, Inc. became the operator of the lease in 2013. Tamarron operated the wells on the lease until 2015. Lease production records from the Texas Railroad Commission indicated that the wells on the lease have not been operated since July 2015. Meng asserted in his motion for summary judgment that Tamarron filed for bankruptcy in September 2015.

At the time of the summary judgment hearing, there were three separate forty-acre units under the lease—Unit No. 2, Unit No. 4, and Unit No. 7. Lessees claimed that each of the three units were capable of producing in paying quantities. Unit No. 4 and Unit No. 7 each have a single unplugged well on them, the Meng No. 4 Well and the Meng No. 7 Well. Unit No. 2 has two unplugged wells on it, the Meng No. 2 Well and the Meng No. 9 Well. The parties do not present any claims about the Meng No. 9 Well in this appeal. Therefore, we only discuss the rights to the Meng No. 2 Well because the lease on Unit No. 2 will terminate on both the Meng No. 2 Well and the Meng No. 9 Well to the same extent.

2

In February 2001, Nolan and Gramrich sued Meng, asserting that Meng was interfering with their production operations. They specifically asserted that Meng prevented Nolan and Gramrich from laying a pipeline to market the oil and gas produced on the lease. After Nolan and Gramrich filed suit, Meng agreed to permit access to lay the pipeline, and Nolan and Gramrich did nothing further to prosecute the suit until they filed their first amended petition in February 2016. In their 2016 first amended petition, Nolan and Gramrich kept all of the allegations from the original petition and additionally asserted that Meng continued to interfere with their operations over the course of the fifteen-year hiatus that the suit remained pending. Nolan and Gramrich alleged that Meng engaged in actions that were bizarre and numerous.

The record does not indicate that Nolan and Gramrich did anything further to prosecute the lawsuit until Lessees filed their second amended petition in March 2017, when they added SL Richardson Investments, Inc. as a plaintiff. Lessees also requested that the case be set for trial.

By the time Lessees filed their fifth amended petition in March 2018, Lessees' live pleadings included claims for breach of contract, conversion, declaratory judgment, tortious interference with prospective relations, and civil theft. Lessees sought injunctive relief, damages, and declaratory relief. In response, Meng asserted the affirmative defenses of laches, lease termination, lack of standing, and limitations. Meng also filed a counterclaim seeking a declaratory judgment that the lease had terminated and that Lessees had forfeited the equipment on the lease. Meng also sought Rule 13 sanctions against Lessees and a mandatory injunction for the wells to be plugged. *See* TEX. R. CIV. P. 13.

Meng filed a no-evidence motion for summary judgment on the issue of lease termination and a traditional motion for summary judgment on the issues of lease termination, equipment forfeiture, laches, and standing. Lessees filed a competing

3

no-evidence and traditional motion for summary judgment. The trial court granted Meng's no-evidence and traditional motions for summary judgment on all grounds, and denied Lessees' motion. The trial court also denied all objections to summary judgment evidence in its summary judgment order.

*Analysis*

*Evidentiary Objections*

We review summary judgments de novo. *Lujan v. Navistar, Inc.*, 555 S.W.3d 79, 84 (Tex. 2018) (citing *Provident Life & Accident Ins. Co. v. Knott*, 128 S.W.3d 211, 215 (Tex. 2003)). However, a trial court's decision to exclude or admit summary judgment evidence is reviewed for an abuse of discretion. *Id.* (citing *Starwood Mgmt., LLC v. Swaim*, 530 S.W.3d 673, 678 (Tex. 2017)). As noted above, the trial court denied all of the objections to the summary judgment evidence. Accordingly, we must determine if the trial court abused its discretion in its rulings on the summary judgment evidence. *See id.*; *Sw. Energy Prod. Co. v. Berry-Helfand*, 491 S.W.3d 699, 727 (Tex. 2016) (A trial court's evidentiary rulings are reviewed for abuse of discretion.). An abuse of discretion exists only when the court's decision is made without reference to any guiding rules and principles. *U-Haul Int'l, Inc. v. Waldrip*, 380 S.W.3d 118, 132 (Tex. 2012). "An appellate court must uphold the trial court's evidentiary ruling if there is any legitimate basis for the ruling." *Owens-Corning Fiberglas Corp. v. Malone*, 972 S.W.2d 35, 43 (Tex. 1998).

In their third issue, Lessees contend that the trial court erred by denying their objections to Meng's affidavits. Lessees first assert that there is a conflict in the dates in Meng's affidavits. Lessees assert that these statements violate the "sham affidavit" rule expressed in *Lujan*. 555 S.W.3d at 85–90. In his first affidavit, Meng asserted that "[t]he #7 ceased production *before* March 1, 2014 . . . . The #4 ceased production *on or before* October 9, 2015 . . . ." (emphasis added). In his subsequent

affidavit, Meng asserted that "[t]he #7 ceased production *before* January 1, 2014 . . . . The #4 ceased production *on or before* June 2015 . . . ." (emphasis added).

The court in *Lujan* determined that if "the subsequent affidavit clearly contradicts the witness's earlier testimony involving the suit's material points, without explanation, then the sham affidavit rule applies." *Id.* at 88 (internal quotation marks omitted). The court also noted that "[m]ost differences between a witness's affidavit and deposition are more a matter of degree and details than direct contradiction. This reflects human inaccuracy more than fraud." *Id.* (quoting *Cantu v. Preacher*, 53 S.W.3d 5, 10 (Tex. App.—San Antonio 2001, pet. denied).

Meng's subsequent statement does not constitute a sham affidavit. A statement that production ceased *on or before* October 9, 2015, does not preclude the possibility that production ceased before that date. Rather, it expressly includes that possibility. Subsequent testimony that production actually ceased on or before June 2015 is not contradictory or even inaccurate. Therefore, the sham-affidavit rule does not apply, and the trial court did not err in admitting Meng's affidavits over Lessees' sham-affidavit contention.

Lessees also assert that statements in Meng's affidavits concerning key witnesses were conclusory. In support of his claim for laches, Meng averred in his affidavits that, because of Lessees' delay, Meng took no action to defend himself, which resulted in material facts and witnesses being lost or compromised. Meng stated that he "[knew] of at least three key witnesses who have died since the alleged events: Hartsell Ash, Betty Jo Reid, and Tot Richards." Lessees assert that this evidence is conclusory and not proper summary judgment evidence because Meng failed to specify what relevant testimony any of the named witnesses would have provided. We disagree.

"A moving party may demonstrate that it has suffered a detrimental change in several ways. If the moving party meets that burden by showing that its 'ability to

5

defend against the claim or to ascertain the true facts is impaired, then plaintiff's claim should be barred.'" *Thorne v. Union Pac. Corp.*, 290 F. Supp. 3d 635, 645 (W.D. Tex. 2017), *aff'd*, 742 Fed. App'x 875 (5th Cir. 2018) (quoting *De Benavides v. Warren*, 674 S.W.2d 353, 362 (Tex. App.—San Antonio 1984, writ ref'd n.r.e.)); *see also Ex Parte Saenz*, 491 S.W.3d 819, 825 (Tex. Crim. App. 2016) (holding that it may be possible for a delay between the filing of an initial application and the amended application to prejudice a party and implicate laches). A defendant may be injured by the plaintiff's delay in bringing suit "because of the death of witnesses by whom the truth of the situation could be proven." *Pearson v. Am. Fid. & Cas. Co.*, 321 S.W.2d 620, 622 (Tex. App.—Amarillo 1959, writ ref'd n.r.e.). However, conclusory statements indicating merely that there are missing witnesses, fading memories, or lost evidence are insufficient to prove the defendant was detrimentally affected. *See Stanley Works v. Wichita Falls Indep. Sch. Dist.*, 366 S.W.3d 816, 825–26 (Tex. App.—El Paso 2012, pet. denied). "A conclusory statement is 'one that does not provide the underlying facts to support the conclusion.'" *Alphaville Ventures, Inc. v. First Bank*, 429 S.W.3d 150, 160 (Tex. App.—Houston [14th Dist.] 2014, no pet.) (quoting *Hou-Tex, Inc. v. Landmark Graphics*, 26 S.W.3d 103, 112 (Tex. App.—Houston [14th Dist.] 2000, no pet.)).

Here, Lessees asserted that Meng started a fire on the property and was involved in a physical altercation with Hartsell Ash around the same time and place as the fire. It was not conclusory for Meng to assert that Ash, a participant in the event, could have provided helpful testimony in clarifying the circumstances surrounding the altercation and fire. It was also not conclusory for Meng to state that Lessees delayed in prosecuting the claims for fifteen years, that Ash has since died, and that Meng lost the ability to examine a witness who would have otherwise been helpful to determine the truth of Lessees' allegations. Thus, the record supports Meng's assertion that Lessees' delay detrimentally affected Meng. *Cf. Stanley*

6

*Works*, 366 S.W.3d at 825–26 (holding evidence of laches insufficient where the defendant failed to point to specific witnesses that were missing or provide any evidence indicating the substance of the witness's expected testimony). Thus, the trial court did not abuse its discretion in overruling this objection. We overrule Lessees' third issue.

In Meng's first cross-issue, he contends that the trial court erred in admitting Lessees' affidavits. Meng initially asserts that the trial court erred in admitting Lee Richardson's affidavit because his testimony was not made on personal knowledge. Richardson averred in his affidavit that Meng interfered with Lessees' operations in bizarre and numerous ways over the fifteen-year hiatus of this case. Richardson stated during his deposition that, although he did not personally witness many of Meng's alleged instances of interference, Richardson was told about Meng's actions from others after they occurred. Richardson also averred that he confronted Meng about each instance and that Meng did not deny that such events occurred. Lessees respond to Meng's contention by asserting that Meng's silence after being questioned constituted admissions by a party opponent and, thus, constitutes personal knowledge.

Generally, "[s]upporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, *and* shall show affirmatively that the affiant is competent to testify to the matters stated therein." TEX. R. CIV. P. 166a(f) (emphasis added). This rule clarifies that an affidavit must still be based on personal knowledge even if it sets forth admissible evidence. *See id.*; *see also Fontenot v. Univ. of Tex. M.D. Anderson Cancer Ctr.*, No. H-06-3756, 2008 WL 11487950, at *8 (S.D. Tex. April 15, 2008, no pet.) (holding under the rule's federal counterpart, "even where evidence might otherwise be admissible as an admission by a party-opponent under Federal Rule of Evidence

7

801(d)(2), such evidence may still be excluded where it does not satisfy the personal knowledge requirement of Federal Rule of Civil Procedure 56(e)").

Even assuming that the statements might have constituted an admission by a party opponent, as Lessees contend, Richardson explicitly admitted in his deposition that he did not have personal knowledge of the events that he had averred occurred. This is inconsistent with his affidavit's recitation that "[t]he facts and statements contained in this affidavit are within [his] personal knowledge, true and correct." Because Richardson did not sufficiently establish that he had personal knowledge of the facts contained within his affidavit, the trial court abused its discretion by admitting the challenged statements. Therefore, the trial court erred in admitting the portions of Richardson's affidavit that were not based on his personal knowledge. The one exception to this holding is the portion of Richardson's affidavit in which Richardson averred that he witnessed Meng parking his truck in the middle of the road as Lessees were approaching the wells.

Meng also contends that John Riley's affidavit was improper opinion evidence. Riley was the pumper on the lease until 2013. However, he averred that he continued to check on the wells for Richardson and SLR Investments in during 2013, 2014, and 2015. Riley opined in his affidavit, "In my opinion[,] the wells have or are capable of producing in paying or commercial quantities if operated properly."

Conclusory statements and opinions in affidavits are improper summary judgment evidence. *See* TEX. R. CIV. P. 166a(f*); Elizondo v. Krist*, 415 S.W.3d 259, 264 (Tex. 2013). The test for determining production in paying quantities is whether the revenue gained from the production exceeds the operating costs and whether a prudent operator would continue operating the lease for the purpose of making a profit. *Clifton v. Koontz*, 325 S.W.2d 684, 691 (Tex. 1959). Riley did not set forth any facts in his affidavit tending to prove that the revenue gained exceeded the operating costs, and he did not present facts tending to prove that a prudent operator

8

would continue operating the lease for a profit. Moreover, the record is devoid of evidence of the units' profits or operating costs altogether. Without such evidence, Riley's testimony that the wells have been capable of producing in paying quantities is conclusory and is improper summary judgment evidence. Accordingly, the trial court erred in admitting this portion of Riley's affidavit.

*Summary Judgment*

In their first issue, Lessees contend that the trial court erred in granting Meng's no-evidence and traditional motion for summary judgment. In their second issue, Lessees assert that the trial court erred by denying their motion for partial summary judgment.

After an adequate time for discovery, a party may move for summary judgment on the ground that there is no evidence of one or more essential elements of a claim or defense on which an adverse party would have the burden of proof at trial. TEX. R. CIV. P. 166a(i). We review a no-evidence motion for summary judgment under the same legal sufficiency standard as a directed verdict. *Merriman v. XTO Energy, Inc.*, 407 S.W.3d 244, 248 (Tex. 2013). Under this standard, the nonmovant has the burden to produce more than a scintilla of evidence to support each challenged element of its claims. *Id.* Evidence is no more than a scintilla if it is "so weak as to do no more than create a mere surmise or suspicion" of a fact. *King Ranch, Inc. v. Chapman*, 118 S.W.3d 742, 751 (Tex. 2003) (quoting *Kindred v. Con/Chem, Inc.*, 650 S.W.2d 61, 63 (Tex. 1983)).

A party moving for traditional summary judgment bears the burden of proving that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. TEX. R. CIV. P. 166a(c); *Nassar v. Liberty Mut. Fire Ins. Co.*, 508 S.W.3d 254, 257 (Tex. 2017). To be entitled to a traditional summary judgment, a defendant must conclusively negate at least one essential element of the cause of action being asserted or conclusively establish each element of an affirmative

9

defense. *Sci. Spectrum, Inc. v. Martinez*, 941 S.W.2d 910, 911 (Tex. 1997). Evidence is conclusive only if reasonable people could not differ in their conclusions. *City of Keller v. Wilson*, 168 S.W.3d 802, 816 (Tex. 2005). If the movant initially establishes a right to summary judgment on the issues expressly presented in the motion, then the burden shifts to the nonmovant to present to the trial court any issues or evidence that would preclude summary judgment. *See City of Houston v. Clear Creek Basin Auth.*, 589 S.W.2d 671, 678–79 (Tex. 1979). In reviewing both traditional and no-evidence summary judgments, we consider the evidence in the light most favorable to the nonmovant, indulging every reasonable inference in favor of the nonmovant and resolving any doubts against the movant. *Merriman*, 407 S.W.3d at 248; *City of Keller*, 168 S.W.3d at 824.

Usually, when a party moves for both a traditional and a no-evidence summary judgment, we first review the no-evidence summary judgment. *See Lightning Oil Co. v. Anadarko E&P Onshore, LLC*, 520 S.W.3d 39, 45 (Tex. 2017). "However, this rule is not absolute." *Neurodiagnostic Tex, L.L.C. v. Pierce*, 506 S.W.3d 153, 163 (Tex. App.—Tyler 2016, no pet.).

*Standing*

Meng moved for traditional summary judgment asserting that Gramrich and Nolan do not have standing to claim that the lease continues in existence. The trial court did not expressly find a lack of standing, but it granted Meng's traditional motion on all grounds, which included the issue of standing. Lessees assert that Nolan and Gramrich have standing to sue for one hundred percent of the damages incurred by the initial interference to laying the pipeline in 2001 and that Meng has not proven that Nolan and Gramrich lack standing to claim that the lease did not terminate.

Because standing is a requirement of subject-matter jurisdiction, we review a trial court's determination of standing de novo. *Frost Nat'l Bank v. Fernandez*, 315

10

S.W.3d 494, 502 (Tex. 2010). "In Texas, the standing doctrine requires a concrete injury to the plaintiff and a real controversy between the parties that will be resolved by the court." *Heckman v. Williamson Cty.*, 369 S.W.3d 137, 154 (Tex. 2012). "[I]f a plaintiff lacks standing to assert one of his claims, the court lacks jurisdiction over that claim and must dismiss it." *Id.* at 150.

Nolan's and Gramrich's standing to litigate the termination of the lease is not clear cut one way or the other. Nolan was the original lessee under the lease, and it originally was the sole working interest owner under the lease. However, Nolan assigned one hundred percent of its working interest to others in May 2001. Gramrich was originally the operator under the lease, but Gramrich was removed as operator in 2013. We conclude that the record does not conclusively establish that Nolan and Gramrich do not have standing to litigate the existence of the lease.[1] Accordingly, Meng was not entitled to summary judgment on his standing contention.

*Laches*

Meng's traditional motion for summary judgment also asserted that Lessees' claims for damages, breach of contract, and tortious interference were barred by laches. Meng bases his laches claim on the assertion that Lessees did not prosecute the claims alleged in their original petition with diligence. Laches is an affirmative defense that is akin to estoppel. *City of Fort Worth v. Johnson*, 388 S.W.2d 400, 403 (Tex. 1964). A party asserting the affirmative defense of laches must show (1) an unreasonable delay by the nonmovant in asserting their legal and equitable rights and (2) a good faith change in position by the movant to his detriment because of the delay. *See Rogers v. Ricane Enters., Inc.*, 772 S.W.2d 76, 80 (Tex. 1989). "Laches is generally available as an affirmative defense solely in suits in equity . . . ."

---

[1]Richardson is the principal for all three corporate Appellants.

*Phillips v. Dow Chem. Co.*, 186 S.W.3d 121, 129 (Tex. App.—Houston [1st Dist.] 2005, no pet.). Thus, laches is generally inappropriate when a statute of limitations applies to the cause of action. *Lyle v. Jane Guinn Revocable Trust*, 365 S.W.3d 341, 355 (Tex. App.—Houston [1st Dist.] 2010, pet. denied).

A cursory review of Texas cases that address laches indicates that the defense typically reviews a delay in bringing suit. Conversely, a delay in the prosecution of a suit after it is filed is typically addressed in the context of a failure of a plaintiff to prosecute his suit with reasonable diligence. *See In re Conner*, 458 S.W.3d 532, 534–35 (Tex. 2015) (orig. proceeding) (per curiam) (A plaintiff has a duty to prosecute its lawsuit to a conclusion with "reasonable diligence," and if the plaintiff fails in that duty, the trial court may dismiss the case for want of prosecution.). Assuming laches was available to Meng in the context in which he presents the claim, the summary judgment evidence does not conclusively establish his entitlement to it, particularly on the issue of his detriment caused by the delay. Accordingly, Meng was not entitled to summary judgment on the affirmative defense of laches.

*Competing Motions for Summary Judgment on Lease Termination*

Meng primarily based his summary judgment motion on his contention that the lease on each unit had terminated for lack of production. Conversely, Lessees assert that Meng repudiated the lease prior to termination. As set out below, the interplay between these competing contentions is a central issue in this case, particularly from a timing perspective. When the parties file competing summary judgment motions on the same issue, and the trial court grants one and denies the other, "we consider the summary judgment evidence presented by both sides, determine all questions presented, and if the trial court erred, render the judgment the trial court should have rendered." *Sw. Bell Tel., L.P. v. Emmett*, 459 S.W.3d 578, 583 (Tex. 2015).

*Duration of an Oil and Gas Lease*

In Texas, an oil and gas lease grants a fee simple determinable to the lessee. *BP Am. Prod. Co. v. Red Deer Res., LLC*, 526 S.W.3d 389, 394 (Tex. 2017) (citing *Anadarko Petroleum Corp. v. Thompson*, 94 S.W.3d 550, 554 (Tex. 2002)). "As a result, 'the lessee's mineral estate may continue indefinitely, as long as the lessee uses the land for its intended purpose.'" *Id.* (quoting *Thompson*, 94 S.W.3d at 554). "However, if the event upon which the mineral estate is limited occurs, then the lessee's mineral estate terminates automatically." *Id.* (citing *Thompson*, 94 S.W.3d at 554). "We resolve the question of when a lease terminates by ascertaining the parties' intent from the lease as a whole." *Id.* (citing *Thompson*, 94 S.W.3d at 554).

"A lease's habendum clause defines the mineral estate's duration." *Id.* (quoting *Thompson*, 94 S.W.3d at 554). "A typical habendum clause provides that the lease will remain in force during a fixed primary term and 'as long thereafter as oil, gas or other minerals is produced' during the secondary term." *Id.* (quoting *Thompson*, 94 S.W.3d at 554). The lease in this case provided for a primary term of three years.

Ordinarily, production of oil and gas from any part of leased acreage is sufficient to hold the entirety of the leased property. *Mayo Found. for Med. Educ. v. Courson Oil & Gas, Inc.*, 505 S.W.3d 68, 70 (Tex. App.—Amarillo 2016, pet. denied). However, the parties' lease also contained a retained-acreage clause whereby each producing well held only a designated unit around it. *See Endeavor Energy Res., L.P. v. Discovery Operating, Inc.*, 554 S.W.3d 586, 598 (Tex. 2018) (discussing the purpose and effect of a retained-acreage clause). As noted previously, the three units at issue in this case were forty acres in size. The lease provided that each "[s]uch unit acreage shall only be held by production."

"The word 'produce' in a habendum clause 'is synonymous with the phrase "producing in paying quantities."'" *Red Deer*, 526 S.W.3d at 394 (quoting

13

*Hydrocarbon Mgmt., Inc. v. Tracker Expl., Inc.*, 861 S.W.2d 427, 432 n.4 (Tex. App.—Amarillo 1993, no writ)). "'Production in paying quantities' means 'the production is sufficient to pay the lessee a profit, even small, over the operating and marketing expenses, although the cost of drilling the well may never be repaid.'" *Id.* (quoting *Tracker*, 861 S.W.2d at 432 n.4). "For purposes of determining whether a marginally productive well has ceased to produce in paying quantities, profitability must be measured over a reasonable period of time under the circumstances." *Id.* (citing *BP Am. Prod. Co. v. Laddex, Ltd.*, 513 S.W.3d 476, 487 (Tex. 2017); *Clifton*, 325 S.W.2d at 691).

"Although the habendum clause generally controls the mineral estate's duration, other clauses may extend the habendum clause's term." *Id.* (quoting *Thompson*, 94 S.W.3d at 554). "Thus, after the primary term, an oil and gas lease generally may be kept alive 'by production in paying quantities, or a savings clause, such as a shut-in gas well clause, drilling operations clause, or continuous operations clause.'" *Id.* (quoting *Tracker*, 861 S.W.2d at 432). A savings clause is designed to prevent the automatic termination of the lease upon a cessation of production. *Id.* Here, the lease contained a savings clause in the form of a cessation-of-production clause.

"[A] typical cessation-of-production clause provides that a lease will remain in force during the secondary term in the absence of actual production if the lessee conducts drilling or reworking operations within a fixed number of days of the original cessation of production." *Id.* at 394–95 (citing *Samano v. Sun Oil Co.*, 621 S.W.2d 580, 580–81 (Tex. 1981)). In *Red Deer*, the Texas Supreme Court noted that a cessation-of-production clause is based on a total cessation of production: "A total cessation of production for the number of consecutive days defined in a lease's cessation-of-production clause automatically terminates the lease, without regard to the reasonableness of the operator's actions, absent a properly invoked savings

14

clause." *Id.* at 395–96. Thus, termination of a lease under a cessation-of-production clause is an alternative basis for terminating a lease that differs from a claim that a lease terminates because of a failure of production in paying quantities. *Id.* at 394–96.

As we noted in *Teon Management*, "[t]he law is well-settled in Texas that the repudiation of a lease by a lessor relieves the lessee of any obligation to conduct any operation on the land in order to maintain the lease in force pending a judicial resolution of the controversy between the lessee and the lessor over the validity of the lease." *Teon Mgmt., LLC v. Turquoise Bay Corp.*, 357 S.W.3d 719, 730 (Tex. App.—Eastland 2001, pet. denied) (citing *Kothmann v. Boley*, 308 S.W.2d 1, 4 (Tex. 1957); *Cheyenne Res., Inc. v. Criswell*, 714 S.W.2d 103, 105 (Tex. App.—Eastland 1986, no writ)). "The doctrine of repudiation is a variation of the doctrine of estoppel, and it applies when the lessor has asserted a clear, unequivocal challenge to the lessee's title in and to the interest created by the lease." *Id.* As stated by the Texas Supreme Court in *Coastal Oil & Gas*:

> The law is well-settled in Texas that "[l]essors who . . . wrongfully repudiate the lessees' title by unqualified notice that the leases are forfeited or have terminated cannot complain if the latter suspend operations under the contract pending a determination of the controversy and will not be allowed to profit by their own wrong."

*Coastal Oil & Gas Corp. v. Garza Energy Tr.*, 268 S.W.3d 1, 20 (Tex. 2008) (alterations in original) (quoting *Ridge Oil Co. v. Guinn Invs., Inc.*, 148 S.W.3d 143, 157 (Tex. 2004)).

The elements of repudiation of an oil and gas lease are (1) the existence of a subsisting lease at the time of repudiation and (2) the lessor's unqualified notice that the lease has been forfeited or terminated. *Rippy Interests, LLC v. Nash*, 475 S.W.3d 353, 362–63 (Tex. App.—Waco 2014, pet. denied). Also implicit in this doctrine is a third element—the lessee's reliance on the lessor's repudiation. *Id.* From a timing

perspective, we must determine if Meng's alleged repudiation of the lease occurred before or after the termination of the units held under the lease. *See id.* A repudiation occurring after the lease on a unit had already terminated would have no legal significance. *See id.*

*Lease Termination vs. Repudiation*

In his no-evidence motion for summary judgment, Meng asserted that Lessees had no evidence of any production after the following dates:

For Well No. 7/Unit No. 7 – After January 1, 2014;

For Well No. 2/Unit No. 2 – After April 1, 2014; and

For Well No. 4/Unit No. 4 – After June 30, 2015.

Meng additionally asserted that there was no evidence of production in paying quantities after these dates. With respect to Well No. 4, Meng additionally asserted that Lessees had no evidence that they commenced reworking operations within sixty days of the cessation of production.

In his traditional motion for summary judgment, Meng asserted that Lessees judicially admitted that production last occurred on Well No. 7, Well No. 2, and Well No. 9 in September 2014. Meng asserted that the two units held by these wells (Unit No. 2 and Unit No. 7) terminated in September 2015 under the terms of the lease. Meng also asserted in his traditional motion for summary judgment that Lessees admitted that Well No. 4 last produced in June 2015 and that the unit held by this well (Unit No. 4) terminated in August 2015.

The record conclusively establishes that production completely ceased on Unit No. 2 and Unit No. 7 in September 2014, and on Unit No. 4 in June 2015. The parties do not dispute that these are the last dates of production of oil and gas. The record also contains evidence that Meng allegedly repudiated the lease at the latest in October 2015. In this regard, Lessees assert that Meng repudiated the lease on October 28, 2015, when Meng allegedly stated to Lessees: "The lease is over. It's

16

finished. It's terminated."[2] Lessees presented evidence that, when Meng allegedly made the October 28, 2015 statement, they made no attempts to produce the lease thereafter "because Mr. Meng had said the lease is terminated, it's over, and we felt like we needed to resolve it legally before anything else happened." Viewed in the light most favorable to Lessees, Lessees have presented sufficient summary judgment evidence to create a material fact issue concerning whether Meng repudiated the lease on October 28, 2015. As previously noted, the major question in this case was whether the units held by the lease had terminated prior to Meng's repudiation in October 2015.

Lessees further assert that Meng previously repudiated the lease on numerous occasions over the fifteen-year hiatus of the case proceedings. In sum, Lessees contend that Meng's various other alleged instances of interference outlined in Lessees' affidavits also constituted repudiation. We disagree. We first note that many of the matters that Lessees assert constituted repudiation by Meng were only addressed in the portions of Richardson's affidavit that we have determined should have been stricken. Furthermore, the record is devoid of facts tending to prove that these other alleged instances of interference constituted unqualified notice of lease termination or that Lessees relied on them to terminate their activities on the lease.

The only other instance that likely constituted an unqualified notice by Meng that the lease had terminated was set out in Riley's affidavit, wherein he indicated that Meng had told him in 2013 that the lease had terminated and that all interest had reverted back to Meng. Even taken as true, though, Lessees did not rely on this statement in suspending operations as a result thereof. Lessees admit that both Meng and Lessees allowed the lease to continue during the fifteen-year hiatus because both

---

[2]On January 11, 2016, Meng also sent a letter to Lessees stating that the remaining Units were all terminated, that the equipment thereon was forfeited, and that trespassers would be prosecuted to the fullest extent of the law.

17

parties were making money on the lease and because it was in everyone's best interest to allow Lessees to continue producing the lease. Because both Meng and Lessees understood the lease to be valid and continuing during this time, Lessees did not rely on any of Meng's other alleged instances of repudiation as unqualified notice that the lease terminated. Therefore, only Meng's October 28, 2015 statement constituted unqualified notice of repudiation upon which Lessees relied to suspend lease operations.

Lessees' claims that are addressed by Meng's no-evidence motion include their claims for declaratory judgment, injunction, conversion, and civil theft. These claims are inextricably intertwined with the issue of lease termination because the viability of these claims is contingent upon the success of Meng's traditional summary judgment grounds for lease termination. Because our analysis of lease termination under Meng's traditional motion is dispositive of the claims addressed by Meng's no-evidence motion, we analyze only Meng's traditional motion. *See Neurodiagnostic Tex, L.L.C.*, 506 S.W.3d at 163.

In his traditional motion for summary judgment, Meng sought a declaratory judgment that the lease had terminated as a matter of law. The parties primarily dispute who bears the burden to prove lease termination and cessation of production, each contending the other party bears the burden. Lessees contend that the trial court erred in granting summary judgment on the issue of lease termination because the trial court improperly placed the burden on Lessees.

We note at the outset that the differing burdens are immaterial under these facts because Meng's motion for summary judgment is a hybrid motion and both parties brought forth summary judgment evidence. *See Neely v. Wilson*, 418 S.W.3d 52, 59 (Tex. 2013); *Rippy Interests*, 475 S.W.3d at 358–59. Therefore, our primary goal is to determine whether a material fact issue exists. *See Neely*, 418 S.W.3d at 59; *Rippy Interests*, 475 S.W.3d at 358–59. Furthermore, each party bore their own

respective burdens to prove that the lease did or did not terminate. *See TRO–X, L.P. v. Anadarko Petroleum Corp.*, 548 S.W.3d 458, 464–65 (Tex. 2018) ("It is [a] well accepted postulate of the common law that a civil litigant who asserts an affirmative claim for relief has the burden to persuade the finder of fact of the existence of each element of his cause of action." (alteration in original) (quoting *Vance v. My Apartment Steak House of San Antonio, Inc.*, 677 S.W.2d 480, 482 (Tex. 1984))). "Thus, when both parties, i.e., both the plaintiff and the defendant, have filed actions for declaratory relief, 'both parties [are] required to carry their own burden on their own request for relief.'" *Castille v. Serv. Datsun, Inc.*, No. 01-16-00082-CV, 2017 WL 3910918, at *7 (Tex. App.—Houston [1st Dist.] Sept. 7, 2017, no pet.) (mem. op.) (alteration in original) (quoting *City of Galveston v. Giles*, 902 S.W.2d 167, 172 (Tex. App.—Houston [1st Dist.] 1995, no writ)).

Lessees sought affirmative declaratory relief that the lease remained valid and in full force and effect. Therefore, Lessees bore the burden to prove either that there was continuous production as required by the terms of the lease or that the lease did not terminate for some other reason. *See TRO–X, L.P.*, 548 S.W.3d at 464–65. Likewise, Meng counterclaimed for declaratory relief that the lease had terminated. Therefore, Meng also bore an equal burden to prove cessation of production of oil and gas for a duration required by the terms of the lease. *See id.* at 464–65; *Castille*, 2017 WL 3910918, at *7–8.

The cessation-of-production clause in the parties' lease provides as follows:

[1] If, after the expiration of the Primary Term, production shall cease on any unit, or units, Lessee shall have the right at any time within sixty (60) days from the first of such cessation to begin drilling or reworking operations in the effort to make any or all such units again produce oil or gas, in which event this Lease shall remain in force thereon so long as not more than sixty (60) days shall elapse between the completion of one such operation and the beginning of another, and if production of oil or gas is therefore resumed, so long thereafter as oil

19

or gas is produced from the subject units. [2] However, in the event of said cessation, if sixty (60) consecutive days elapses during which no such operation is executed, this Lease shall terminate as to any unit designation on which there has been no production of oil or gas for said sixty (60) days, save and except 1/2 acre around the wellhead for a period of one year. [3] After the Primary Term and any Extension of this Lease, the term "reworking operations", as operative in this clause, shall be more exactly construed to mean "major overhaul or replacement of pump-jack or engine, or working in the bore-hole.["] [4] Furthermore, yet not to include shut-in gas wells, if twelve (12) months shall elapse during which a unit does not produce in paying quantities, this Lease shall terminate on any such well.[3]

The parties disagree on the manner in which this provision should be interpreted. We will address their contentions with respect to our discussion of the units held by the lease.

*Unit No. 2 and Unit No. 7*

As noted previously, production from Unit No. 2 and Unit No. 7 ceased in September 2014. Meng asserted in his traditional motion for summary judgment that the lease on these units terminated in September 2015, a date prior to the October 2015 repudiation. For this proposition, Meng cited the fourth sentence of the cessation-of-production clause: "Furthermore, yet not to include shut-in gas wells, if twelve (12) months shall elapse during which a unit does not produce in paying quantities, this Lease shall terminate on any such well."

Lessees contend that Meng failed to provide evidence of the economic elements of the production-in-paying-quantities test and, therefore, failed to meet his burden of proof. We disagree. Generally, to prove that the lease terminated due to cessation of production in paying quantities, one must establish that (1) the well's production over a reasonable period of time does not yield a profit over operating expenses, and (2) if so, a prudent operator would not continue operating the well for

---

[3]We have inserted numbers for the sentences for future reference in this opinion.

the purpose of making a profit rather than merely for speculation. *Skelly Oil Co. v. Archer*, 356 S.W.2d 774, 783 (Tex. 1962) (on reh'g) (per curiam); *Clifton*, 325 S.W.2d at 690–91. But as we noted in *Brown v. Reeter*, Texas courts have made an evidentiary distinction between claims alleging total cessation of production versus those involving a cessation of production in paying quantities. 170 S.W.3d 151, 155 (Tex. App.—Eastland 2005, no pet.) (citing *Cannon v. Sun–Key Oil Co.*, 117 S.W.3d 416, 421–22 (Tex. App.—Eastland 2003, pet. denied); *Ridenour v. Herrington*, 47 S.W.3d 117, 121–22 (Tex. App.—Waco 2001, pet. denied); *Bachler v. Rosenthal*, 798 S.W.2d 646, 650 (Tex. App.—Austin 1990, writ denied); *Wainwright v. Wainwright*, 359 S.W.2d 628, 630 (Tex. App.—Fort Worth 1962, writ ref'd n.r.e.)). "When there has been a 'total cessation of production,' the two-prong 'cessation of production in paying quantities' analysis does not apply." *Id.* Simply put, production in paying quantities cannot occur if production ceases. *See id.* Accordingly, Meng did not need to address the profitability of obtaining production from Unit No. 2 and Unit No. 7 because he alleged, and the record establishes, a complete cessation of production for over twelve months. *See id.*

The remaining element of whether a valid, subsisting lease existed on Unit No. 2 and Unit No. 7 at the time of repudiation depends upon an interpretation of the cessation-of-production clause in the lease. Under Lessees' interpretation, the twelve-month period set out in the fourth sentence only begins to run after the sixty-day period set out in the first and second sentences expired. Thus, Lessees contend that they had fourteen months from the time that production ceased to resume operations and that Meng's repudiation in the thirteenth month prevented the lease on the units from terminating. *See id.* We disagree with Lessees' reading of the cessation-of-production clause.

We interpret an oil and gas lease as we would any other contract. *Tittizer v. Union Gas Corp.*, 171 S.W.3d 857, 860 (Tex. 2005). Here, neither party contends

that the lease is ambiguous. "Construing an unambiguous lease is a question of law for the court." *Thompson*, 94 S.W.3d at 554 (citing *Luckel v. White*, 819 S.W.2d 459, 461 (Tex. 1991)). In construing an unambiguous oil and gas lease, our primary objective is to determine the intent of the parties as expressed within the four corners of the lease. *Id.* at 555; *Tittizer*, 171 S.W.3d at 857. "We give terms their plain, ordinary, and generally accepted meaning[s] unless the instrument shows that the parties used them in a technical or different sense." *Heritage Res., Inc. v. NationsBank*, 939 S.W.2d 118, 121 (Tex. 1996). "We examine the entire lease and attempt to harmonize all its parts, even if different parts appear contradictory or inconsistent." *Thompson*, 94 S.W.3d at 554 (citing *Luckel*, 819 S.W.2d at 462). We presume that the parties intend every clause to have some effect. *Id.* We must enforce an unambiguous document as written. *Heritage Res., Inc.*, 939 S.W.2d at 121.

As we noted previously, the Texas Supreme Court in *Red Deer* addressed the purpose and effect of a cessation-of-production clause. 526 S.W.3d at 394–95. While it is a savings clause, it provides an alternative basis for the termination of a lease when there is a total cessation of production that is separate from a claim that a lease terminates because of a failure of production in paying quantities. *Id.* at 394–96. The cessation-of-production clause in this lease reflects both bases for terminating a lease. The first and second sentences of the clause provide for a termination of the lease after sixty days of total cessation of production during which the lessee takes no efforts toward drilling or reworking. Conversely, the fourth sentence sets out the period of time during which production in paying quantities is to be measured. *See Clifton*, 325 S.W.2d at 690; *Ridenour*, 47 S.W.3d at 121–22. In this regard, the fourth sentence provides a definition of the applicable time period for determining production in paying quantities, much like the third sentence provides a definition for "reworking operations."

22

Lessees' contention that they were allowed fourteen months to resume production in paying quantities after production first ceased contradicts the lease's plain language. The fourth sentence does not provide that its twelve-month period begins after the sixty-day period referenced in the first and second sentences. As previously noted, it only refers to the period of time to be used to assess whether marginal production from a well has been sufficient to sustain the lease—a separate basis for lease termination that is an alternative to total cessation of production, which is addressed in the first and second sentences.

Lessees also direct our attention to summary judgment evidence to the effect that the wells were capable of production during the year prior to Meng's alleged repudiation in October 2015. *See Thompson*, 94 S.W.3d at 558 (noting that a well is capable of production when the well is turned "on" and it begins flowing (quoting *Tracker*, 861 S.W.2d at 433–34)). The concept of "capable of production" is typically associated with a shut-in royalty clause. *See Red Deer*, 526 S.W.3d at 395. The lease in this case does not contain a shut-in royalty clause, nor does it contain the phrase "capable of production." It is well established that "'can be produced' does not mean actual production," as required by the habendum clause of this lease. *See Thompson*, 94 S.W.3d at 561.

Finally, Lessees cite the twelve-month provision in the second sentence that provides: "save and except 1/2 acre around the wellhead for a period of one year." This clause applies to a termination based upon reliance of the complete cessation of production under the first two sentences of the cessation-of-production clause. With respect to Unit No. 2 and Unit No. 7, Meng did not rely on this basis for terminating the lease. Instead, Meng relied on the requirement for production in paying quantities as required by the habendum clause, the requisite time period of which was defined by the fourth sentence. Accordingly, the "1/2 acre around the wellhead" provision is inapplicable to Unit No. 2 and Unit No. 7.

23

In summary, Meng sought to terminate the lease as to Unit No. 2 and Unit No. 7 under the habendum clause, as defined by the fourth sentence of the cessation-of-production clause. Meng made the requisite showing by establishing that production in paying quantities did not occur for a period of twelve months—from September 2014 to September 2015. As we noted in *Brown v. Reeter*, production in paying quantities does not occur when there is no production. 170 S.W.3d at 155. Accordingly, Meng established that the lease on Unit No. 2 and Unit No. 7 terminated prior to his repudiation of the lease in October 2015. Therefore, Meng was entitled to traditional summary judgment on his claim that the lease had terminated on Unit No. 2 and Unit No. 7.

*Unit No. 4*

Unit No. 4 ceased production at a later date—June 2015. Meng asserts on appeal that he was entitled to a no-evidence summary judgment with respect to Unit No. 4 on Lessees' claims for affirmative relief because Lessees did not produce evidence that Well No. 4 produced in paying quantities for the one-year period prior to October 2015, when Lessees allege that Meng repudiated the agreement. Unlike with Unit No. 2 and Unit No. 7, there is evidence of some production from Unit No. 4 during the year preceding October 2015. Meng's no-evidence motion for summary judgment alleged only that Lessees had no evidence of production in paying quantities from Unit No. 4 after June 2015. Accordingly, we disagree with Meng's contention that he was entitled to a no-evidence summary judgment as to Unit No. 4 on the basis of no production in paying quantities for a year prior to October 2015.

Meng also sought a traditional summary judgment asserting the same ground—that Lessees had no evidence of production in paying quantities from Unit No. 4 during the one-year period prior to October 2015. However, there is evidence that production from Unit No. 4 occurred through June 2015. To the extent that

Meng sought affirmative relief on the basis that there was no production in paying quantities from October 2014 to October 2015, he bore the burden of establishing the lack of profitability from Unit No. 4 during this period. He has not met this burden.

Meng also asserted that he was entitled to both a no-evidence summary judgment and a traditional summary judgment on the basis that production ceased on Unit No. 4 on June 30, 2015, and that no one began drilling or reworking operations within sixty days of the cessation of production. This assertion is based on the first two sentences of the cessation-of-production clause. The summary judgment evidence conclusively establishes that production ceased on Well No. 4 in June 2015 and that drilling or reworking operations were not commenced within the sixty-day period thereafter. Accordingly, we agree with Meng's contention that the lease on Unit No. 4 terminated at the end of August 2015 when no reworking operations were commenced on Well No. 4 or drilling operations on Unit No. 4. This result is dictated by the second sentence of the cessation-of-production clause, which reads:

> However, in the event of said cessation, if sixty (60) consecutive days elapses during which no such operation is executed, this Lease shall terminate as to any unit designation on which there has been no production of oil or gas for said sixty (60) days, save and except 1/2 acre around the wellhead for a period of one year.

Lessees rely on the "save and except 1/2 acre around the wellhead for a period of one year" language to assert that the lease over Unit No. 4 continued for fourteen months after production ceased in June 2015. We disagree with Lessees' interpretation of this provision. The first part of the second sentence provides that "*this Lease shall terminate* as to any unit designation" from which there has been no production, no drilling, or no reworking operations for sixty days (emphasis added). Accordingly, the lease over Unit No. 4 terminated sixty days after production ceased.

25

Additionally, the save-and-except language only applies to 1/2 acre around the wellhead,[4] and it is only for a fixed duration of one year.

Accordingly, Meng was entitled to a traditional summary judgment on his claim that the lease on Unit No. 4 had terminated. In this regard, the lease on Unit No. 4 terminated at the end of August 2015, prior to Meng's repudiation of the lease on October 28, 2015.

*Equipment Forfeiture*

Meng also moved for a traditional summary judgment on the issue of equipment forfeiture. He sought a declaration that Lessees had forfeited all rights to the machinery and fixtures on the lease. In response, Lessees contend that, because the lease on the units did not terminate prior to Meng's repudiation of the lease, Lessees did not forfeit their rights to the machinery and fixtures on the units. However, we have determined that the lease on the units terminated prior to the October 2015 repudiation.

The lease contains the following removal-of-fixtures clause:

> Upon termination of this Lease due to any cause, Lessee has one hundred twenty (120) days to remove all machinery and fixtures, including drawing and removing casing along with plugging of wells on subject units thereto. At the end of this one hundred twenty (120) days, Lessee relinquishes all rights to any equipment remaining on such units.

As stated above, the lease terminated on Unit No. 2 and Unit No. 7 in September 2015 and on Unit No. 4 at the end of August 2015. However, Meng's repudiation of the lease occurred during the 120-day period for the removal of fixtures. And with respect to Unit No. 4, repudiation occurred during the "1/2 acre around the wellhead" period. We conclude that there are fact questions on the effect of Meng's

---

[4]"Wellhead" is "the top of the hole from which hydrocarbons exit, or the visible structure over the well." *Springer Ranch, Ltd. v. Jones*, 421 S.W.3d 273, 281–82 (Tex. App.—San Antonio 2013, no pet.) (citing various dictionaries).

repudiation on these various provisions that preclude summary judgment on the issue of equipment forfeiture.

*Summary Judgment Conclusion*

We conclude that the trial court did not err by granting summary judgment in favor of Meng on the issue of lease termination. Furthermore, the trial court did not err in denying Lessees' motion for partial summary judgment on the same issue. However, the trial court erred by granting summary judgment in favor of Meng on the issues of standing, laches, and equipment forfeiture. Accordingly, we overrule Lessees' second issue (concerning their motion for partial summary judgment). With respect to Lessees' first issue, we overrule it in part to the extent that it addresses lease termination on Unit No. 2, Unit No. 7, and Unit No. 4. However, we sustain it as to the issues of standing, laches, and equipment forfeiture, and we remand those issue for trial.

*Meng's Request for Injunctive Relief and Sanctions*

In his third cross-issue, Meng contends that the trial court erred in declaring final judgment as to all issues pending between the parties and denying all other relief not expressly granted therein. Specifically, Meng also counterclaimed for a mandatory injunction that Lessees be required to plug the wells that have terminated. He also counterclaimed for sanctions against Lessees for bringing a suit for the sole purpose of harassment. However, these issues were not brought before the trial court in any of the summary judgment motions.

"A trial court cannot dispose of a claim by summary judgment that has not been challenged in a motion for summary judgment." *Pink v. Goodyear Tire & Rubber Co.*, 324 S.W.3d 290, 293 (Tex. App.—Beaumont 2010, pet. dism'd) (citing *Teer v. Duddlesten*, 664 S.W.2d 702, 703 (Tex. 1984) (op. on reh'g)); *see generally* TEX. R. CIV. P. 166a(c). Therefore, the trial court erred by disposing of Meng's

27

claims for injunctive relief and sanctions because they were not the subject of the summary judgment motions. We sustain Meng's third cross-issue.

*Attorney's Fees*

In Lessees' fourth issue, they contend that the trial court erred by denying their request for attorney's fees on their declaratory-judgment and breach-of-contract actions. They assert that they are raising this issue to avoid a possible waiver. In his second cross-issue, Meng also challenged the denial of his request for attorney's fees. Because we are remanding all claims other than the question of lease termination, we sustain Lessees' fourth issue and Meng's second cross-issue and remand the issue of attorney's fees for all parties for trial.

*This Court's Ruling*

We affirm the trial court's summary judgment in favor of Meng to the effect that the lease on Unit No. 2, Unit No. 7, and Unit No. 4 has terminated. All other issues and claims in the case are remanded for trial.

JOHN M. BAILEY
CHIEF JUSTICE

May 28, 2021

Panel consists of: Bailey, C.J.,
and Wright, S.C.J.[5]

Trotter, J., and Williams, J., not participating.

---

[5]Jim R. Wright, Senior Chief Justice (Retired), Court of Appeals, 11th District of Texas at Eastland, sitting by assignment.