Opinion issued July 2, 2024



In The

# Court of Appeals

For The

# First District of Texas

————————————————

## NO. 01-22-00569-CV

————————————————

**NATIONAL SIGNS, LLC, Appellant**

**V.**

**GREGG HOLLENBERG, Appellee**

---

**On Appeal from the 295th District Court**
**Harris County, Texas**
**Trial Court Case No. 2018-49082**

---

## MEMORANDUM OPINION

Appellant, National Signs, LLC, challenges the trial court's judgment, entered

after a jury trial, in the suit of appellee, Gregg Hollenberg, against National Signs,

LLC for breach of contract. In four issues, National Signs, LLC contends that the evidence is legally insufficient to support the judgment in favor of Hollenberg.[1]

We affirm.

## Background

Hollenberg filed suit against National Signs, LLC on July 24, 2018. In his final amended petition, Hollenberg alleged that he entered into an employment agreement with National Signs, LLC on February 11, 2008. The employment agreement "provide[d] that if Hollenberg terminate[d] the [t]erm of [e]mployment for [g]ood [r]eason," National Signs, LLC would "pay Hollenberg, through the end of the month in which termination became effective," his base salary, business expenses, benefits, car allowance, bonuses, and severance payment. The employment agreement's definition of "[g]ood [r]eason" included "the assignment of [Hollenberg] without his consent to . . . responsibilities, or duties of a materially lesser status or degree of responsibility" and National Signs, LLC's "material breach" of the employment agreement. (Internal quotations omitted).

According to Hollenberg, "[g]ood [r]eason" existed for him to terminate his employment agreement with National Signs, LLC because: (1) National Signs, LLC had "underpaid Hollenberg by a total of $261,985.81 since 2011"; (2) the

---

[1] Although not precisely framed as such in its briefing, National Signs' four issues all challenge the legal sufficiency of the evidence supporting the trial court's judgment.

2

employment of SenLy Fox, National Signs, LLC's vice president of sales and marketing, who had worked under Hollenberg's direct supervision, "was terminated without Hollenberg's advance knowledge, consent, or involvement"; and (3) National Signs, LLC "conducted meetings with the vast majority of [its] employees without Hollenberg's presence, involvement, participation, or consent." (Internal quotations omitted.)

Hollenberg further alleged that he "did not discover the underpayment of his salary [under the employment agreement] until October 2017." And at that time, "he promptly disclosed the issue to [National Signs, LLC]," but National Signs, LLC "refused to make the required salary increase." Several months later, "[o]n March 29, 2017, Hollenberg gave [National Signs, LLC] . . . written notice of the existence of '[g]ood [r]eason' for [the] termination of his employment and afforded [National Signs, LLC] an opportunity to cure." But National Signs, LLC "refused its opportunity to cure," and "Hollenberg's employment with [National Signs, LLC] . . . came to an end on April 3, 2018."

Thereafter, Hollenberg notified National Signs, LLC in writing that he considered its "failure to pay him the compensation due" a material breach of his employment agreement, "which relieved Hollenberg of any duty to comply with the postemployment restrictions on competition" set out in the employment agreement.

3

Hollenberg brought a claim against National Signs, LLC for breach of contract, seeking compensation for the underpayment of his salary and the failure to pay him $161,224.00 in "[g]ood [r]eason" termination benefits which he alleged were owed to him under the employment agreement. (Internal quotations omitted.) Hollenberg also sought to recover his reasonable and necessary attorney's fees.[2]

National Signs, LLC answered, generally denying the allegations in Hollenberg's petition and asserting, among other things, that Hollenberg's breach-of-contract claim was barred by "estoppel, equitable estoppel, or quasi-estoppel" and "the applicable statute of limitations." Also, according to National Signs, LLC, National Signs Ltd. and Hollenberg had modified the employment agreement "by their course of performance by failing to pay Hollenberg the raise called for by the [employment] agreement," and National Signs, LLC had "assumed the contract" from National Signs Ltd. "as modified." Further, National Signs, LLC asserted that Hollenberg had "failed to comply with" the employment agreement's "notice-and-cure provisions."

Additionally, National Signs, LLC asserted that Hollenberg "lack[ed] privity of contract as to his claimed breach" because his "claim[] focus[ed] on serial breaches of his employment agreement that occurred before [National Signs, LLC] . . . assumed" the employment agreement in April 2012. Alternatively,

---

[2]    *See* TEX. CIV. PRAC. & REM. CODE ANN. § 38.001(b)(8).

4

National Signs, LLC alleged that it "did not assume" the employment agreement between National Signs Ltd. and Hollenberg.

At trial, Hollenberg testified that in 2008, he entered an employment agreement with National Signs Ltd. The employment agreement, a copy of which was admitted into evidence, provided that Hollenberg would serve as "the [c]hief [o]perating [o]fficer reporting directly to the [p]resident" of National Signs Ltd. Hollenberg would be National Signs Ltd.'s "second-highest executive." As chief operating officer, Hollenberg, among other things, was charged with "[m]anaging and supervis[ing]" National Signs Ltd.'s "sales and marketing efforts . . . with a goal of achieving at least $15,000,000[.00] in gross sales . . . for each calendar year during [his] [t]erm of [e]mployment."

Further, under the employment agreement, Hollenberg was obligated, among other things, to use his best efforts to:

A. Create, develop, establish, maintain, and manage a sales and marketing department consisting of a minimum of eight (8) qualified full-time sales representatives, one (1) qualified full-time sales manager, and one (1) qualified full-time marketing manager . . . ;

B. Create, develop, establish, maintain and manage a customer service department consisting of at least one (1) full-time customer service representative and a detailed written customer service program and set of protocols for customer service matters . . . ; and

C. Manage and supervise the sales and marketing efforts of [National Signs Ltd.]

5

The employment agreement set Hollenberg's initial annual "base salary" at $160,000.00 and provided for incremental increases as follows:

> In the second [c]ontract [y]ear, the [b]ase [s]alary will be increased by a minimum of five percent (5%), i.e., to a minimum of $168,000.00. Beginning on the third [c]ontract [y]ear and for each [c]ontract [y]ear thereafter, the [b]ase [s]alary will be increased by a minimum of six percent (6%) over the [b]ase [s]alary paid to [Hollenberg] in the immediately preceding [c]ontract [y]ear. For purposes of this [a]greement the first "[c]ontract [y]ear" means the twelve month period beginning on the [e]ffective [d]ate, and each subsequent [c]ontract [y]ear shall be considered to begin on the applicable anniversary date of the [e]ffective [d]ate.

The employment agreement also provided for Hollenberg to receive other benefits, such as commissions, various types of bonuses, four weeks of paid vacation, and a car allowance. Further, the employment agreement stated that "[a]ny subsequent change or changes in [Hollenberg's] duties, salary, or compensation, [would] not affect [the agreement's] validity or scope."

Hollenberg explained that the employment agreement "renewed each year." And he understood that annual renewal was necessary because things like "job titles," "salary," and "benefits change over time." "So every year, there was a . . . renewal agreement." The renewal agreement was incorporated into the employment agreement, which provided: "The term of employment as used herein, shall mean a period commencing February 11th, 2008, and shall continue for one year. And unless terminated sooner or as herein provided, shall automatically renew on a year-to-year basis."

6

In the first two contract years of his employment, Hollenberg was "paid for everything" he was owed under the employment agreement. But after National Signs, LLC succeeded National Signs Ltd. through an interest purchase agreement in April 2012 (the "transaction"), he "did not receive the correct amount of [his] compensation."

On April 13, 2012, Hollenberg received a letter from Al Ross (the "letter agreement"), who was then the chief executive officer of National Signs Ltd., addressing monthly performance bonuses. Ross explained in the letter agreement that it served as an "amendment to the [employment agreement]" and would "become effective upon the closing of [the transaction]." The letter agreement stated that "[u]pon the closing of the [transaction]," Hollenberg would "become eligible to receive a bonus for the fiscal year end[ing] [on] December 31, 2012, based on the [a]udited [earnings before interest, taxes, depreciation, and amortization ('EBITDA')] (as defined in the [interest] [p]urchase [a]greement) of the [t]arget (as defined in the [interest] [p]urchase [a]greement) for such fiscal year and a percentage of [his] current annual base salary ($168,000.00)," and it provided a schedule calculating the potential bonuses. The letter agreement further stated that Hollenberg "agree[d] that the aforementioned bonus [wa]s in lieu of and replace[d] the [a]nnual [b]onus" that Hollenberg otherwise would have been "entitled to receive under [the employment agreement]." And the letter agreement declared that

7

"[e]xcept as may be expressly set forth in th[e] letter, all provisions, terms and conditions in the [employment agreement] remain[ed] unmodified and in full force and effect." Hollenberg understood that the modification expressed in the letter agreement changed only the bonus structure and not the salary that he was owed under the employment agreement. And, according to Hollenberg, the parenthetical mention of his annual base salary as $168,000.00 in the letter agreement was not an agreement by Hollenberg to that amount.

Hollenberg further explained that at the time of the transaction, his "base salary should have been $200,000[.00]." As part of the transaction, he received a payment from National Signs Ltd. as a "true-up" to the base salary amount he was owed. Thus, the base salary after the transaction "should have been" calculated based "off the $200,000[.00]." Hollenberg did not intend to decrease the amount of compensation he was owed under the employment agreement, and he did not have any discussions with anyone at National Signs, LLC that he was agreeing to reduce his compensation.

In 2013, Hollenberg sent an email request for confirmation that his base salary would be adjusted to $178,090.00 to Tripp Rice, president of National Signs, LLC's board of directors and a representative of Tulcan Private Equity ("Tulcan"), the firm that owned National Signs, LLC. Hollenberg acknowledged in his trial testimony

8

that the base salary amount that he had requested in 2013 "probably was not" correct and that he had made a "math calculation error."

In 2015, Hollenberg "proposed a deferral" of his 2016 salary increase "in the interest of the company." He confirmed in an email to Rice that he would "be deferring [his] salary increase until after the [National Signs, LLC's] audit [wa]s complete" and the "management bonuses [were] approved." According to Hollenberg's proposal, National Signs, LLC would then "true[-]up and pay [his] total deferred back salary back to February 11th, 2015."

Hollenberg "first realized" in October 2017 that there was a calculation error in the amount of base salary that he had been paid. At that time, he was preparing for a meeting to discuss his interest in serving on the National Signs, LLC's board of directors. He reviewed the employment agreement "just to ensure there was no conflict" of interest or "any restriction on the [chief executive officer] being a part of the board." During "that detailed review," Hollenberg "looked at the calculations" used to determine his base salary and realized that "something just wasn't right."

Hollenberg explained that he was told that as part of the transaction, his employment agreement with National Signs Ltd. was assigned to National Signs, LLC. As to whether the transaction affected his rights under the employment agreement, Hollenberg observed that paragraph 24 of the employment agreement

9

provided that the "agreement [would] inure to the benefit of and be binding upon the [e]mployer and its successors and assigns and upon the [e]xecutive and his heirs, legal representatives and estate." (Internal quotations omitted.) Hollenberg also noted that the employment agreement had a "no waiver" provision, which stated:

> No waiver by a party of any breach of this [a]greement shall be a waiver of any preceding or succeeding breach by such party. No waiver by a party of any right under this [a]greement shall be construed as a waiver of any other right by such party. Neither party shall be required to give notice to enforce strict adherence to all terms of this [a]greement, unless otherwise provided for herein.

Hollenberg "first raised" the issue of the discrepancy between the amount of base salary that he was owed under the employment agreement and the amount that he had actually been paid in an October 2017 meeting with representatives of Tulcan. According to Hollenberg, Louis Girard and Wirt Blaffer, the two Tulcan representatives present at the meeting, acknowledged that there was an issue and they "all agreed that [they] would do more fact gathering" about it "going forward."

On March 25, 2018, Hollenberg sent an email to the Tulcan representatives about the base salary "calculation error." His initial request "was to true[-]up the salary going forward" to the contract year beginning on February 11, 2018. The first to respond to the email was Amanda Tanner, National Signs, LLC's comptroller, who had been copied on the email. Tanner asked that the Tulcan representatives "let [her] know [their] decision" on the matter "as soon as possible so that [she could] include" any salary adjustment for Hollenberg in that week's payroll. Tulcan

10

representative David Hartland responded that "[g]iven the length of time the miscalc[ulation] ha[d] been embedded," the salary issue would "take a little longer than" one week to resolve. Wirt also responded, stating that the Tulcan representatives had been "out of the office all day . . . in meetings and need[ed] to discuss the issue with [Tanner] and [Hollenberg]."

A couple of days later, Hollenberg sent another email to the Tulcan representatives in which he stated that he had "not heard anything since [they] sent [the] email . . . asking for a chance to review" Hollenberg's proposal "together[,] before any . . . changes [we]re made." Hollenberg let them know that he was "happy at any time" to discuss "the true-up calculations" and their "implications." He also informed the Tulcan representatives that he had directed Tanner to submit his salary increase to payroll that "week along with the true[-]up amount" from February 11, 2018 to March 9, 2018. And Hollenberg explained that such "increase only addresse[d] the salary deficiency for the two current payroll periods" and "not the past amounts owed." According to Hollenberg, he received no response to his second email and "[n]o discussion ever took place."

On March 5, 2018, Hollenberg emailed Girard and Blaffer to inform them that six of National Signs, LLC's employees had resigned and all of them had "refused to disclose [their] destination." Hollenberg also informed National Signs, LLC's

11

counsel about the employees' resignations because he "[h]ad reason to believe that they had gone to work with a competitor."

The next evening, Hollenberg received an email from Girard stating that "[g]iven [that] there ha[d] been over six resignations" in the previous "24 hours, it [wa]s incumbent on [Tulcan] to conduct exit interviews" with the departing employees. Girard informed Hollenberg that he and Hartland would be conducting the exit interviews the next day. Hollenberg was not invited to participate and did not participate in the exit interviews, and he regarded Tulcan's involvement in the interviews as an "unusual" development.

A short time after Tulcan conducted the exit interviews, Hollenberg came to learn that Girard was planning to terminate the employment of Fox. On the afternoon of March 8, 2018, Hollenberg received an email from Hartland scheduling a meeting at National Signs, LLC with him and Fox for the next day at 2:30 p.m.

Shortly before the meeting was scheduled to take place, Hollenberg informed Hartland that Fox "had to go to school to handle an issue with her son" and asked to postpone the meeting. Hartland responded, "That's not going to work. [Fox]'s attendance [wa]s required." (Internal quotations omitted.) Hartland then stated that if Fox could not "make it back in the next couple of hours," they could "adjust the meeting to a later time" that afternoon. (Internal quotations omitted.) Hollenberg contacted Fox, who arranged to return to the office.

Girard, Hartland, and Blaffer attended the meeting. They first called Hollenberg into the meeting alone and told him that Fox was "going to be terminated." They then presented Hollenberg with two different letters terminating Fox's employment, one prepared for his signature and the other signed by Girard. The letter prepared for Hollenberg's signature, according to the Tulcan representatives, would "give [Fox] a little bit" of "extra benefits in return for a release." But if Hollenberg refused to sign that letter, they would use the other letter, which would terminate Fox's employment with "less compensation, severance." "Ultimately, [Hollenberg] signed th[e] letter" terminating Fox's employment. Hollenberg stated that he did not decide to terminate Fox; "[t]hat decision" had been "already made." And he felt like he had been threatened to sign the letter and terminate Fox's employment.

Hollenberg further testified that the employment agreement allowed him to terminate his employment with National Signs, LLC "for [g]ood [r]eason," which it defined as:

> (i)     the assignment of the [e]xecutive without his consent to a position, responsibilities, or duties of a materially lesser status or degree of responsibility than his position, responsibilities, or duties at the [e]ffective [d]ate;
>
> (ii)     the [e]mployer's material breach of this [a]greement; or
>
> (iii)     the requirement by the [e]mployer that the [e]xecutive be based anywhere other than within 50 miles of [National Signs, LLC's] offices.

13

On March 29, 2018, Hollenberg gave National Signs, LLC written notice of the existence of "[g]ood [r]eason" for termination of his employment agreement, citing (1) Tulcan's decision to terminate Fox's employment without Hollenberg's "advance notice or consent," (2) Tulcan's "meetings with every employee" of National Signs, LLC without Hollenberg's "presence, involvement, participation or consent," and (3) Tulcan's refusal to "make corrections to [Hollenberg's] current salary." National Signs, LLC accepted Hollenberg's resignation but did not agree that it was based on "[g]ood [r]eason."

Ross testified that he was the owner of National Signs Ltd. He hired Hollenberg in 2008 and promoted him to President "a year or so" later. "[B]efore the transaction," Ross had "some sort of a conversation about some true-up period" with Hollenberg and gave him a $32,000.00 payment. Ross understood "true[-]up" as meaning, "in the world of business, you get together and calculate and see . . . how much you've been paid and what you should have been paid, what the end results are." When Ross was working with Hollenberg, they "did this quite often, because sometimes . . . the accounting would change." After having "three to four months to get the accounting done," he would "go back" to Hollenberg and say: "Okay. [Hollenberg], we paid you this much. And this is what you should have been paid, so . . . we owe you this much."

14

From the day in January 2012 that Ross sold National Signs Ltd. until the effective date of the transaction in April 2012, Ross "was pretty much prohibited from touching anything in th[e] company" and "wasn't able to do anything" without "disclos[ing]" it to Tulcan.  The interest purchase agreement between National Signs Ltd. and National Signs, LLC provided that from the date of its execution,

> until the [c]losing, without the prior written consent of [b]uyer, or unless as required or expressly permitted by this [a]greement, none of the [c]ompany . . . w[ould] . . . increase or commit or promise to increase the compensation payable or to become payable to any officer, director, [i]nterest [h]older, employee or agent, consultant or independent contractor or make any discretionary bonus or management fee payment to any such [p]erson, except as disclosed in [the [d]isclosure [s]chedule].

According to Ross, during the covered period, Hollenberg received a $26,017.89 "[b]onus [p]ayment," which was disclosed to Tulcan.  Bonuses paid to other National Signs Ltd. executives were disclosed to Tulcan as well.  The disclosure schedule included with the transaction documents also contained a separate entry that stated, "[p]er [Hollenberg's] contract, his base salary will increase to $168,000[.00] and he will receive a bonus of $32,000[.00] on February 11, 2012." Ross confirmed that $168,000.00 plus $32,000.00 equaled $200,000.00, which was the same amount listed in Hollenberg's employment agreement for his 2012 base salary.

Girard testified that he was the managing director of Tulcan and had signed the interest purchase agreement. Hollenberg was not a party to the interest purchase agreement, but he was an investor in National Signs, LLC.

Girard acknowledged that the interest purchase agreement disclosed that Hollenberg's compensation had increased while the transaction was pending, specifically, that Hollenberg had received a bonus payment of $26,617.89. Girard also agreed that $168,000.00 plus $32,000.000 equaled $200,000.00. And Girard confirmed that the employment agreement was included with the disclosures as part of the transaction.

Girard also explained that he served on National Signs, LLC's board of directors with Blaffer and Rice. The board decided by unanimous consent to terminate Fox's employment. Girard did not know if Hollenberg had been made aware at the time that Fox was going to be terminated.

The jury found that National Signs, LLC had failed to comply with the employment agreement as it related to Hollenberg's base salary and related bonus and that National Signs, LLC's failure to comply was not excused. The jury also found that $165,627.00 would fairly and reasonably compensate Hollenberg for National Signs, LLC's failure to comply with the employment agreement for the period from July 24, 2014 through July 24, 2018. The trial court entered judgment

on the verdict and also awarded Hollenberg his reasonable and necessary attorney's fees, pre- and post-judgment interest, and court costs.

## Standard of Review

When a party attacks the legal sufficiency of an adverse finding on an issue on which it did not have the burden of proof at trial—here, the jury's finding that National Signs, LLC breached the employment agreement—it must demonstrate that no evidence supports the finding. *See Exxon Corp. v. Emerald Oil & Gas, Co.*, 348 S.W.3d 194, 215 (Tex. 2011). We will sustain a legal sufficiency or "no-evidence" challenge if the record shows: (1) a complete absence of evidence of a vital fact, (2) the court is barred by rules of law or evidence from giving weight to the only evidence offered to prove a vital fact, (3) the evidence offered to prove a vital fact is no more than a scintilla, or (4) the evidence establishes conclusively the opposite of the vital fact. *City of Keller v. Wilson*, 168 S.W.3d 802, 810 (Tex. 2005).

When a party challenges the legal sufficiency of an adverse finding on an issue on which it bore the burden of proof at trial—such as a finding against a defendant on an affirmative defense—that party must demonstrate on appeal that the evidence establishes, as a matter of law, all vital facts in support of the issue, and the party may prevail on appeal only if no evidence supports the adverse finding and the contrary position is conclusively established. *See PlainsCapital Bank v. Martin*, 459 S.W.3d 550, 557 (Tex. 2015); *Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 241 (Tex.

17

2001); *see also City of Keller*, 168 S.W.3d at 815–16 (explaining nature of conclusive evidence).

## Legal Sufficiency

### A.      Breach of Employment Agreement

In its first issue, National Signs, LLC argues that the evidence is legally insufficient to support the jury's finding that it breached the employment agreement with Hollenberg because the conclusive evidence showed that National Signs, LLC complied with Hollenberg's employment agreement.[3] According to National Signs, LLC, it complied with the employment agreement because the actual salary Hollenberg was paid in the contract year immediately preceding the transaction—and not the initial base salary set forth in the employment agreement—defined National Signs, LLC's obligations as to Hollenberg's base salary.

A breach-of-contract claim requires proof of four elements: (1) the existence of a valid contract, (2) performance or tendered performance by the plaintiff, (3) breach of the contract by the defendant, and (4) damages sustained by the plaintiff as a result of the defendant's breach. *See B & W Supply, Inc. v. Beckman*, 305 S.W.3d 10, 16 (Tex. App.—Houston [1st Dist.] 2009, pet. denied).

---

[3]      In its briefing, National Signs actually asserts that the evidence is legally and factually insufficient to support the jury's finding of breach, but it maintains only that conclusive evidence showed no breach. This is a legal-insufficiency argument, and we will treat it as such. *See Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 241 (Tex. 2001).

National Signs, LLC's position is not consistent with the plain terms of the employment agreement, which was disclosed to National Signs, LLC and assumed by it in the transaction. Under the employment agreement, Hollenberg was entitled to a base salary of $160,000.00 for his first year of employment, a five percent increase in his base salary for his second year of employment, and a six percent increase in his base salary for each subsequent year. The employment agreement also expressly provided that "[n]o modification of or amendment to th[e] [a]greement, nor any waiver of any rights under th[e] [a]greement, w[ould] be effective unless in writing signed by the party to be charged."

Here, there was no evidence presented at trial of any signed writing showing that the actual base salary Hollenberg was paid in the contract year immediately preceding the transaction modified the salary terms set forth in the employment agreement. Hollenberg and Ross both testified that there was not even any discussion during the transaction as to whether Hollenberg would agree to continue working at a base salary lower than the amount required under the employment agreement.

National Signs, LLC's position also fails to account for the evidence that National Signs Ltd. made a "true-up" payment to Hollenberg while the transaction was pending to bring his 2012 base salary up to the $200,000.00 that he was owed,

19

and it disclosed that information to Tulcan in the disclosure schedule included in the transaction.

Based on the foregoing, we conclude that the evidence does not conclusively establish that National Signs, LLC did not breach the employment agreement. We thus hold that the evidence is legally sufficient to support the jury's finding that National Signs, LLC breached the employment agreement and the trial court did not err in entering judgment consistent with the jury's finding.

We overrule National Signs, LLC's first issue.

## B. Waiver

In its second issue, National Signs, LLC argues that Hollenberg waived any claim that his 2012 base salary should have been $200,000.00 instead of $168,000.00 because the evidence conclusively established waiver.

Waiver is the intentional relinquishment of a known right or intentional conduct inconsistent with claiming that right. *Chalker Energy Partners III, LLC v. Le Norman Operating LLC*, 595 S.W.3d 668, 676 (Tex. 2020); *Jernigan v. Langley*, 111 S.W.3d 153, 156 (Tex. 2003); *Rescue Concepts Inc. v. HouReal Corp.*, --- S.W.3d ---, 2022 WL 2976299, at *8 (Tex. App.—Houston [1st Dist.] July 28, 2022, pet. denied). The elements of waiver include: (1) an existing right, benefit, or advantage held by a party; (2) the party has actual knowledge of the existence of the right; and (3) the party actually intends to relinquish the right or engages in

20

intentional conduct inconsistent with the right. *Ulico Cas. Co. v. Allied Pilots Ass'n*, 262 S.W.3d 773, 778 (Tex. 2008); *Rescue Concepts Inc.*, 2022 WL 2976299, at *8. Waiver can be established by a party's express renunciation of a known right or by "silence or inaction for so long a period as to show an intention to yield the known right." *Aguiar v. Segal*, 167 S.W.3d 443, 451 (Tex. App.—Houston [14th Dist.] 2005, pet. denied).

Waiver is largely a matter of intent, and for implied waiver to be found through a party's actions, the surrounding facts and circumstances must clearly demonstrate the party's intent. *Jernigan*, 111 S.W.3d at 156; *see also Chalker Energy Partners*, 595 S.W.3d at 677 ("[T]o establish waiver by conduct, that conduct must be unequivocally inconsistent with claiming a known right." (internal quotations omitted)). "There can be no waiver of a right if the person sought to be charged with waiver says or does nothing inconsistent with an intent to rely upon such right." *Chalker Energy Partners*, 595 S.W.3d at 677; *Rescue Concepts Inc.*, 2022 WL 2976299, at *8. Waiver is generally a fact question, but if the facts and circumstances are undisputed, it becomes a question of law. *Chalker Energy Partners*, 595 S.W.3d at 676–77; *Jernigan*, 111 S.W.3d at 156–57.

Paragraph 27 of the employment agreement provided:

No waiver by a party of any breach of this [a]greement shall be a waiver of any preceding or succeeding breach by such party. No waiver by a party of any right under this [a]greement shall be construed as a waiver of any other right by such party. Neither party shall be required to give

21

notice to enforce strict adherence to all terms of this [a]greement, unless otherwise provided for herein.

Absent evidence of some act inconsistent with its terms, a nonwaiver provision, like the one in the employment agreement, precludes any showing of waiver as a matter of law. *See Shields Ltd. P'ship v. Bradberry*, 526 S.W.3d 471, 474 (Tex. 2017) ("The decisive issue is whether waiver of a nonwaiver provision can be anchored in the same conduct the parties specifically agreed would not give rise to a waiver of contract rights. We hold it cannot.").

Here, National Signs, LLC has not identified any evidence that Hollenberg intended to waive the employment agreement's nonwaiver provision, and we have found none. Absent such evidence, National Signs, LLC cannot establish that Hollenberg intended to waive his claim that it failed to comply with the employment agreement by underpaying his base salary. *See Shields*, 526 S.W.3d at 474. Because the evidence does not support a finding that Hollenberg acted in a manner that was inconsistent with the terms of the employment agreement's nonwaiver provision, National Signs, LLC did not conclusively prove its affirmative defense of waiver. Thus, we hold that the trial court did not err in entering judgment consistent with the jury's finding that Hollenberg did not waive his breach-of-contract claim.

We overrule National Signs, LLC's second issue.

## C.    Quasi-Estoppel

In its third issue, National Signs, LLC argues that Hollenberg is barred by quasi-estoppel from claiming a 2012 base salary greater than $168,000.00 because the evidence conclusively established that "Hollenberg asserted to [National Signs, LLC's] disadvantage a right inconsistent with a position previously taken."

Quasi-estoppel precludes a party from asserting, to another's disadvantage, a right inconsistent with a position previously taken. *Lopez v. Munoz, Hockema & Reed, LLP*, 22 S.W.3d 857, 864 (Tex. 2000); *Hourani v. Katzen*, 305 S.W.3d 239, 256 (Tex. App.—Houston [1st Dist.] 2009, pet. denied). The doctrine applies when it would be unconscionable to allow a person to maintain an inconsistent position to which he acquiesced or from which he accepted a benefit. *Lopez*, 22 S.W.3d at 864.

To support its argument that Hollenberg was estopped from asserting his underpayment claim, National Signs, LLC relies on the transaction documents, the letter agreement, a March 2012 confidential memorandum signed by Hollenberg that documented his acquisition of a membership interest in National Signs, LLC, and Hollenberg's annual written letters to National Signs, LLC confirming the amount of his base salary compensation from 2012 through 2017. We address each of these in turn.

First, as to the transaction itself, National Signs, LLC argues that Hollenberg was estopped because National Signs, LLC had agreed only to assume the

employment agreement "as disclosed." To the extent that National Signs, LLC relies on the transaction documents, Hollenberg was not a party to the transaction, so they are not evidence that he previously took an inconsistent position. And in any event, Girard testified that the employment agreement, which, according to Hollenberg, contained the correct formula for calculating his annual base salary, was included as a disclosure with the transaction documents. At a minimum then, National Signs, LLC was on notice of a discrepancy between the amount of base salary stated in some of the transaction documents and the amount owed to Hollenberg under the employment agreement.

National Signs, LLC next asserts that the parenthetical reference to Hollenberg's base salary as $168,000.00 in the letter agreement shows that Hollenberg previously took the position that his base salary was supposed to be $168,000.00 in 2012. But Hollenberg testified that he understood that the modification expressed in the letter agreement changed only the bonus structure and not the base salary he was owed under the employment agreement. Further, the letter agreement itself did not discuss any modification to the base salary owed Hollenberg under the employment agreement. On the contrary, it declared that "[e]xcept as may be expressly set forth in this letter, all provisions, terms and conditions in the [employment agreement] remain unmodified and in full force and effect." As such,

24

the letter agreement does not conclusively establish that Hollenberg had previously taken the position that his 2012 base salary was $168,000.00.

National Signs, LLC also points to a March 2012 confidential memorandum signed by Hollenberg that documented his acquisition of a membership interest in National Signs, LLC, which provided: "[p]er [the] employment agreement[], . . . Hollenberg . . . w[ould] receive $168,000[.00] . . . in base salary compensation per year." That sentence suggests that the $168,000.00 base salary amount was consistent with the amount of salary that Hollenberg was due under the employment agreement, but it was not. Not only was the amount inconsistent with the plain language of the employment agreement for the 2012 employment year, the sentence also implies that Hollenberg's salary was to be the same every year, which contradicts other language in the employment agreement requiring an annual six percent base salary increase for Hollenberg beginning in his third contract year. Further, the purpose of the March 2012 confidential memorandum was to document Hollenberg's membership interest in National Signs, LLC, not to fix the amount of Hollenberg's employment compensation. Thus, the March 2012 confidential memorandum is not conclusive evidence that Hollenberg previously took the position that his 2012 base salary was supposed to be $168,000.00.

Finally, as to Hollenberg's annual written confirmation to National Signs, LLC concerning the amount of his base salary from 2012 through 2017, Hollenberg

25

testified that he had made a "math calculation error," did not intend to decrease the amount of compensation he was owed under the employment agreement, and did not have any discussions with anyone at National Signs, LLC indicating that he was agreeing to reduce his compensation. This testimony is some evidence that Hollenberg did not take the position that his base salary should be less than the amount he was due under the employment agreement. Thus, the evidence creates no more than a fact issue about whether Hollenberg took a position about the amount of base salary he was owed in the annual written confirmation.

We conclude that National Signs, LLC failed to show by conclusive evidence that Hollenberg was barred by quasi-estoppel from claiming a 2012 base salary greater than $168,000.00. Accordingly, we hold that the trial court did not err in entering judgment consistent with the jury's finding that Hollenberg was not estopped from asserting his breach-of-contract claim.

We overrule National Signs, LLC's third issue.

## D. Statute of Limitations

In its fourth issue, National Signs, LLC argues that Hollenberg's breach-of-contract claim was barred by the statute of limitations because any breach of the employment agreement with Hollenberg occurred in 2012.[4]

---

[4] In its briefing, National Signs, LLC concedes that it did not ask for a jury question on its statute-of-limitations affirmative defense, so it may prevail on this ground

26

A four-year statute of limitations applies to contract actions. TEX. CIV. PRAC. & REM. CODE ANN. § 16.004. Thus, to satisfy National Signs, LLC's burden, the evidence must conclusively prove that Hollenberg's breach-of-contract claim accrued more than four years before he filed suit. S*ee KPMG Peat Marwick v. Harrison Cnty. Hous. Fin. Corp.*, 988 S.W.2d 746, 748 (Tex. 1999); *see also Nguyen v. Watts*, 605 S.W.3d 761, 782 (Tex. App.—Houston [1st Dist.] 2020, pet. denied).

A breach-of-contract claim accrues at the time of the breach. *Stine v. Stewart*, 80 S.W.3d 586, 592 (Tex. 2002). If the parties' agreement contemplates a continuing contract for performance, the limitations period usually does not commence until the contract is fully performed. *Intermedics, Inc. v. Grady*, 683 S.W.2d 842, 845 (Tex. App.—Houston [1st Dist.] 1984, writ ref'd n.r.e.). In contrast, if the agreement calls for periodic payments while it is in force, a cause of action for such payments may arise at the end of each period, before the contract is completed, even if the initial breach occurred outside the limitations period. *Bierscheid v. JPMorgan Chase Bank*, 606 S.W.3d 493, 510 (Tex. App.—Houston [1st Dist.] 2020, pet. denied); *see also Lyle v. Jane Guinn Revocable Tr.*, 365 S.W.3d 341, 355 (Tex. App.—Houston [1st Dist.] 2010, pet. denied); *Hollander v. Capon*, 853 S.W.2d 723, 726–27 (Tex. App.—Houston [1st Dist.] 1993, writ denied). This

only if the evidence conclusively proves that Hollenberg's breach-of-contract claim was time-barred. *See XCO Prod. Co. v. Jamison*, 194 S.W.3d 622, 632 (Tex. App.—Houston [14th Dist.] 2006, pet. denied); *see also* TEX. R. CIV. P. 279.

rule applies even if the periodic payments owed vary in amount, as long as the agreement requires that the payments be made using a specified formula. *See Trelltex, Inc. v. Intecx, L.L.C.*, 494 S.W.3d 781, 787 (Tex. App.—Houston [14th Dist.] 2016, no pet.). Recovery of any payment that was owed before the four-year limitations period, though, is barred. *See Trelltex, Inc*, 494 S.W.3d at 787; *see also Bierscheid*, 606 S.W.3d at 510.

Here, the employment agreement provided a specified formula for calculating Hollenberg's base salary, and the underpayments found by the jury consisted of the amount Hollenberg was due under the employment agreement each year less the amount he was actually paid. National Signs, LLC argues that Hollenberg's underpayment claim was time-barred because the initial calculation error occurred in 2012. But every year after 2012 required a new calculation of Hollenberg's salary. That the later miscalculations were based on the initial error, which occurred outside the limitations period, does not alter the nature of the contract. *See Bierscheid*, 606 S.W.3d at 510. Hollenberg was still entitled to damages for underpayments that occurred within the limitations period, and the amount awarded in the trial court's judgment was based on the damages found by the jury for the four-year period preceding the filing of Hollenberg's suit.

We conclude that National Signs, LLC has failed to conclusively establish that Hollenberg's breach-of-contract claim was barred by the statute of limitations.[5] We thus hold that the trial court did not err in entering judgment consistent with the jury's finding that Hollenberg's breach-of-contract claim was not barred by the statute of limitations.

We overrule National Signs, LLC's fourth issue.

### Conclusion

We affirm the judgment of the trial court.

Julie Countiss
Justice

Panel consists of Justices Goodman, Countiss, and Farris.

---

[5] In his appellee's brief, Hollenberg argues that he "should be awarded an additional $181,124[.00] in damages" because National Signs breached the employment agreement by failing to pay him termination benefits due under the employment agreement's "[g]ood [r]eason" provision. (Internal quotations omitted.) Texas Rule of Appellate Procedure 25.1 requires any "party who seeks to alter the trial court's judgment" to file a notice of appeal. TEX. R. APP. P. 25.1(c). "[A]n appellee who has not filed a notice of appeal may not seek to alter the trial court's judgment to award the appellee more relief than the trial court granted the appellee." *Frontier Logistics, L.P. v. Nat'l Prop. Holdings, L.P.*, 417 S.W.3d 656, 666 (Tex. App.—Houston [14th Dist.] 2013, pet. denied). Because Hollenberg did not file a notice of appeal or cross-appeal, we may not address this issue.